# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 8, 2011        Decided September 6, 2011

No. 10-5159

AMERICAN CIVIL LIBERTIES UNION AND AMERICAN CIVIL
LIBERTIES UNION FOUNDATION,
APPELLANTS/CROSS-APPELLEE

v.

UNITED STATES DEPARTMENT OF JUSTICE,
APPELLEE/CROSS-APPELLANTS

———

Consolidated with 10-5167

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:08-cv-01157)

———

*Catherine Crump* argued the cause for appellants/cross-appellee. With her on the briefs were *Arthur B. Spitzer* and *David L. Sobel*.

*John S. Koppel,* Attorney, U.S. Department of Justice, argued the cause for appellee/cross-appellants. With him on the briefs were *Ronald C. Machen Jr.*, U.S. Attorney, and *Leonard Schaitman*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: GINSBURG and GARLAND, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: The plaintiffs brought this action against the Department of Justice under the Freedom of Information Act, seeking to obtain documents relating to the government's use of cell phone location data in criminal prosecutions. The district court directed the release of certain specified documents and upheld the Department's decision to withhold others. We affirm the court's order requiring the release of the specified documents. Because there are too many factual uncertainties regarding the remaining documents, we vacate the balance of the court's decision and remand the case for further development of the record.

I

Cell phones generate several types of data that can be used to track their users' past or present locations with various degrees of precision.[1] Concerned by reports that federal law

---

[1] For descriptions of the different kinds of data available, see *In re Application of U.S. for an Order Directing Provider of Elec. Commc'n Serv. to Disclose Records to Gov't*, 534 F. Supp. 2d 585, 589-90 (W.D. Pa. 2008), *vacated*, 620 F.3d 304 (3d Cir. 2010); Kevin McLaughlin, Note, *The Fourth Amendment and Cell Phone Location Tracking: Where Are We?*, 29 HASTINGS COMM. & ENT. L.J. 421, 426-27 (Spring 2007); Recent Development, *Who Knows Where You've Been? Privacy Concerns Regarding the Use of Cellular Phones as Personal Locators*, 18 HARV. J.L. & TECH. 307, 308-10 (Fall 2004); Orin Kerr, *Reader Poll: Do You Know How Cell Phones Work?*, THE VOLOKH CONSPIRACY (Nov. 8, 2010, 1:08 PM), http://volokh.com/2010/11/08/.

enforcement agencies were obtaining these data from telecommunications companies without a judicial determination of probable cause,[2] the American Civil Liberties Union and the American Civil Liberties Union Foundation (ACLU) filed Freedom of Information Act (FOIA) requests with the Drug Enforcement Administration and the Executive Office for United States Attorneys, seeking information relating to the use of warrantless cell phone tracking by certain U.S. Attorneys' Offices. As is relevant to this appeal, the plaintiffs requested records relating to:

> [1] The case name, docket number, and court of all criminal prosecutions, current or past, of individuals who were tracked using mobile location data, where the government did not first secure a warrant based on probable cause for such data, [and]

> [2] Policies, procedures, and practices followed to obtain mobile phone location information for law enforcement purposes.

App. 20, 28.

---

[2]When the government wants to track an individual's location through his or her cell phone, it submits an application to a judge (usually a magistrate judge) seeking an order compelling a telecommunications company to provide access to the location data. The plaintiffs contend that "[p]rosecutors appear to routinely take the view that the government can obtain cell site location information without a warrant, by simply presenting to a magistrate 'specific and articulable facts showing . . . reasonable grounds to believe that . . . the records or other information sought, are relevant and material to an ongoing criminal investigation.'" ACLU Br. 9 (quoting *In re Application of U.S. for an Order for Disclosure of Telecomms. Records & Authorizing Use of Pen Register & Trap & Trace*, 405 F. Supp. 2d 435, 444 (S.D.N.Y. 2005) (quoting 18 U.S.C. § 2703(d))).

On July 1, 2008, the plaintiffs brought suit against the Department of Justice (DOJ) to compel production of the requested records. *See* FOIA, 5 U.S.C. § 552(a)(4)(B). Thereafter, the Department agreed to conduct a search for the requested case names, docket numbers, and courts ("docket information"). It did this by first asking the relevant U.S. Attorneys' Offices to identify applications granted by judges (or magistrate judges), on or after September 12, 2001, to permit the government to obtain cell phone location data from telecommunications companies, where the judge did not make a determination of probable cause. It then asked those offices to provide the docket information for any case in which an individual was prosecuted after such an application was granted. This inquiry generated a list of docket information for 255 criminal prosecutions. Def.'s Statement of Material Facts Not in Dispute at 3-4 (App. 37-38). The Department then withheld the list from disclosure, asserting that it fell within FOIA Exemptions 6 and 7(C). *See* 5 U.S.C. § 552(b)(6), (7)(C).[3]

The Justice Department also produced a *Vaughn* index describing documents responsive to the plaintiffs' request for "policies, procedures, and practices," and invoking various FOIA exemptions to justify the redaction or withholding of some of those documents. *See Vaughn v. Rosen*, 484 F.2d 820, 826-28 (D.C. Cir. 1973). Among the documents listed in the *Vaughn* index was a "Draft Application" to engage in cell phone tracking (Document 22), which the Department withheld in full,

---

[3]Although FOIA only requires a government agency to disclose "agency records improperly withheld," 5 U.S.C. § 552(a)(4)(B), and does not "impose[] [any] duty on the agency to create records," *Forsham v. Harris*, 445 U.S. 169, 186 (1980), the Justice Department did not resist compiling or disclosing the list on that ground -- perhaps because it preferred producing the list (if it came to that) to producing the documents from which the list was created.

and a "Template Application" (Document 29), which the Department produced after redacting the docket number. App. 52, 54. The plaintiffs objected to the withholding of the case name in Document 22, and of the docket numbers in both Documents 22 and 29.[4]

The parties filed cross motions for summary judgment. In assessing the Justice Department's invocation of Exemptions 6 and 7(C), the district court began by "allocat[ing] a greater privacy interest to persons who were acquitted, or whose cases were dismissed or sealed (and remain under seal), and a considerably lesser privacy interest to persons who were convicted, or who entered public guilty pleas." *ACLU v. Dep't of Justice*, 698 F. Supp. 2d 163, 166 (D.D.C. 2010). The court held that the public interest in disclosure outweighed the privacy interest in the second category but not in the first. Accordingly, the court ordered the Department to release the requested docket information only in cases that ended in convictions or public guilty pleas. *Id.*

With respect to the two government applications for cell phone data, the court concluded that the Department had properly withheld the case name and docket numbers under Exemption 7(C). In light of the plaintiffs' concession that any personally identifiable information about surveillance targets who had not yet been prosecuted could be redacted from the case name, the court refused to order the "meaningless production" of a case name in which "nothing would be left but variants of the phrase 'In re: Application for Cell Site

---

[4]Other documents listed in the index, or portions thereof, were either produced to the plaintiffs' satisfaction before the district court ruled, *see ACLU v. Dep't of Justice*, 698 F. Supp. 2d 163, 165 n.1 (D.D.C. 2010), or are no longer at issue on this appeal, ACLU Br. 4 n.2, 30 n.21.

Authority.'" *Id.* at 166-67. The court also rejected the plaintiffs' argument that, because such applications are invariably filed under seal, disclosure of the applications' docket numbers would not reveal any personally identifying information. The court found that disclosure "could reveal surveillance targets yet to be prosecuted, . . . either because the cases are not actually sealed, or because the plaintiffs' promised motion to unseal could be successful." *Id.* at 167.

Both parties appeal. The Justice Department challenges the portion of the district court's decision directing it to release docket information in prosecutions of persons who were convicted or entered public guilty pleas. The plaintiffs challenge the portion of the decision denying their request to require the production of docket information in prosecutions of persons who were acquitted, or whose cases were dismissed or sealed (and remain under seal). The plaintiffs also challenge the court's denial of their request to require disclosure of the case name in the "Draft Application" (Document 22), and the docket numbers in both that document and the "Template Application" (Document 29).

II

We review the district court's disposition on summary judgment *de novo*. *See Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833-34 (D.C. Cir. 2001). "In the FOIA context this requires that we ascertain whether the agency has sustained its burden of demonstrating that the documents requested are . . . exempt from disclosure under the FOIA." *Gallant v. NLRB*, 26 F.3d 168, 171 (D.C. Cir. 1994); *see* 5 U.S.C. § 552(a)(4)(B) (stating that "the burden is on the agency to sustain its action").

FOIA was intended "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) (internal quotation marks omitted). "Although Congress enumerated nine exemptions from the disclosure requirement, 'these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.'" *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting *Rose*, 425 U.S. at 361). "At all times[,] courts must bear in mind that FOIA mandates a 'strong presumption in favor of disclosure,'" *id.* (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)), "and that the statutory exemptions, which are exclusive, are to be 'narrowly construed,'" *id.* (quoting *Rose*, 425 U.S. at 361). As the Supreme Court reminded appellate courts just this year, it has "often noted the Act's goal of broad disclosure and insisted that the exemptions be given a narrow compass." *Milner v. Dep't of the Navy*, 131 S. Ct. 1259, 1265 (2011) (internal quotation marks omitted).

FOIA Exemptions 6 and 7(C) seek to protect the privacy of individuals identified in certain agency records. Under Exemption 6, "personnel and medical files and similar files" may be withheld if disclosure "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Under Exemption 7(C), "records or information compiled for law enforcement purposes" may be withheld "to the extent that" disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Although the Justice Department relied on both exemptions in the district court, we need only consider whether it properly invoked Exemption 7(C). The plaintiffs concede that the requested records are subject to that exemption because they are "records compiled for law enforcement purposes." *See ACLU*, 698 F. Supp. 2d at 165 n.2. And because

Exemption 7(C) permits withholding of such records if disclosure would constitute an "unwarranted" invasion of personal privacy, while Exemption 6 requires a "*clearly* unwarranted" invasion to justify nondisclosure, "Exemption 7(C) is more protective of privacy than Exemption 6" and thus establishes a lower bar for withholding material. *U.S. Dep't of Defense v. FLRA*, 510 U.S. 487, 496 n.6 (1994); *see also Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 165-66 (2003).[5]

In deciding whether the release of particular information constitutes an "unwarranted" invasion of privacy under Exemption 7(C), we "must balance the public interest in disclosure against the [privacy] interest Congress intended the Exemption to protect." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 776 (1989); *see Favish*, 541 U.S. at 171; *Ray*, 502 U.S. at 175 (quoting *Rose*, 425 U.S. at 372). The public interest that must be weighed in this balance is the extent to which disclosure advances "the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny,'" *Reporters Comm.*, 489 U.S. at 772 (quoting *Rose*, 425 U.S. at 372), thereby furthering "the citizens' right to be informed about 'what their government is up to,'" *id.* at 773.

In this Part, we examine the material the district court ordered the Justice Department to disclose: docket information (case name, docket number, and court) from criminal cases in which the government prosecuted individuals after judges

---

[5]As a consequence, we do not address the parties' dueling post-argument letters discussing the manner in which the Supreme Court's recent decision in *Milner*, *see* 131 S. Ct. at 1271, which narrowly construed the term "personnel" in FOIA Exemption 2, affects the proper construction of FOIA Exemption 6.

granted applications for cell phone location data without a determination of probable cause, and in which those individuals were subsequently convicted or entered public guilty pleas. In Subpart A we consider the privacy interest and in Subpart B the public interest attendant to disclosure. In Part III, we consider the material that the district court declined to order the Department to disclose.

A

1. The first question we must ask is whether there is any privacy interest at stake here. In a given case, after all, the disclosure of the docket number, case name, and court may alone reveal little or nothing about an individual: the number and court plainly would not, and although the case name might (if it included more than just a relatively common last name), by itself it would disclose neither the charges nor the disposition. Nonetheless, in evaluating the privacy impact of the release of information, the courts have taken into consideration potential derivative uses of that information.[6] And here, it would take

---

[6]*See Dep't of Defense v. FLRA*, 510 U.S. at 501; *Ray*, 502 U.S. at 177; *FLRA v. U.S. Dep't of the Treasury*, 884 F.2d 1446, 1452 (D.C. Cir. 1989); *NARFE v. Horner*, 879 F.2d 873, 878 (D.C. Cir. 1989); *see also infra* note 15. As we explained in *NARFE v. Horner*:

> In virtually every case in which a privacy concern is implicated, someone must take steps after the initial disclosure in order to bring about the untoward effect. Disclosure does not, literally by itself, constitute a harm; it is the requester's (or another's) reaction to the disclosure that can sting. This is only more obvious where disclosure of the information invades someone's privacy not because it is embarrassing but because it invites unwanted intrusions. Where there is a substantial probability that disclosure will

little work for an interested person to use the docket information on the government's list to look up the underlying case files in the public records of the courts, and therein find the information of interest.  Although this can be done manually, it can also be readily accomplished using the federal court system's own public-access database, Public Access to Court Electronic Records (PACER),[7] or private databases like Westlaw or LexisNexis.  Indeed, the plaintiffs have made clear that they intend to use the docket information in this way.  ACLU Reply Br. 23-24.

There is also the question of just how much of a privacy interest a defendant retains regarding the facts of his or her conviction or public guilty plea.  We tend to agree with the district court that the disclosure of convictions and public pleas is at the lower end of the privacy spectrum.  The parties agree as well.  *See* ACLU Reply Br. 11; DOJ Br. 19.  This is not to say that a convicted defendant has *no* privacy interest in the facts of his conviction.  As the government points out, disclosure of a criminal conviction may be "embarrassing [and] stigmatizing," and may endanger one's prospects "for successful reintegration into the community."  DOJ Br. 20-21, 26.  But it is to say that those interests are weaker than for individuals who have been acquitted or whose cases have been dismissed.  *Accord* ACLU Reply Br. 11; DOJ Br. 19.  And they are plainly substantially

cause an interference with personal privacy, it matters not that there may be two or three links in the causal chain.

879 F.2d at 878.

[7]PACER, provided by the federal judiciary, "is an electronic public access service that allows users to obtain case and docket information from [all] federal appellate, district and bankruptcy courts."  PACER: Public Access to Court Electronic  Records, http://www.pacer.gov.

weaker than the privacy interests of individuals who have been investigated but never publicly charged at all. *See Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 864 (D.C. Cir. 1981) ("Typically, the decision not to prosecute insulates individuals who have been investigated but not charged from th[e] rather significant intrusion into their lives" occasioned by public indictment.).[8]

Nonetheless, there is no real dispute that the scope of Exemption 7(C) can extend even to convictions and public pleas. In *U.S. Department of Justice v. Reporters Committee for Freedom of the Press*, the Supreme Court held that release of the contents of an FBI "rap sheet" -- which may have included a record of the subject's convictions -- constituted an unwarranted invasion of personal privacy under FOIA Exemption 7(C). *See* 489 U.S. at 780. The Court held "as a categorical matter" that "a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy," and that such records may

---

[8]The Justice Department correctly notes this court has held that disclosure of records revealing that an individual was involved or mentioned in a law enforcement investigation implicates a significant privacy interest. *See Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 661, 666 (D.C. Cir. 2003); *Safecard Servs., Inc. v. SEC*, 926 F.2d 1197, 1205 (D.C. Cir. 1991); *Fitzgibbon v. CIA*, 911 F.2d 755, 767 (D.C. Cir. 1990); *Senate of the Commonwealth of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 588 (D.C. Cir. 1987); *Fund for Constitutional Gov't*, 656 F.2d at 863-64, 873; *Bast v. Dep't of Justice*, 665 F.2d 1251, 1254 (D.C. Cir. 1981); *see also Favish*, 541 U.S. at 166; *Blackwell v. FBI*, 2011 WL 2600831, at *2 (D.C. Cir. July 1, 2011). But in those cases, the subjects of the court's concern were individuals who had never been charged, let alone convicted. Moreover, we again note that the question in this case is not whether a convicted defendant has any privacy interests, but rather how much of an interest he has in the public-record facts of his conviction.

therefore not be disclosed in the absence of a cognizable public interest. *Id.* As the docket numbers and case names the plaintiffs seek constitute "law enforcement . . . information" that will (through derivative use) identify private citizens who have been criminally prosecuted, disclosure implicates those citizens' privacy interests.

2. The privacy interests at stake in this case, however, are considerably weaker than those at issue in *Reporters Committee*. The law enforcement records at issue there were rap sheets that revealed the subjects' "date of birth and physical characteristics, as well as a history of arrests, charges, convictions, and incarcerations" in every jurisdiction in the country. 489 U.S. at 752. And they covered the subject's entire life: the FBI normally preserved a rap sheet until its subject turned eighty years old. *Id.*

Here, the information sought is quite different. As already noted, the list alone contains little that is personal. But even if the docket information is used to find the underlying proceedings, for any particular individual it most likely would reveal only a single prosecution, rather than a comprehensive scorecard of the person's entire criminal history.[9] It would disclose only information concerning a conviction or plea; it would not disclose mere charges or arrests. It would disclose only information that has already been the subject of a public proceeding (either a trial or public guilty plea), rather than actions (like arrests) that may not have taken place in public. It would disclose only information that is available in public records, which post-indictment filings always are and arrests

---

[9]Disclosure would reveal more than one prosecution only if there were multiple prosecutions of the same individual among the 255 prosecutions listed. The Justice Department has not suggested that is the case.

may not be. *Cf. Reporters Comm.*, 489 U.S. at 754 n.2 (noting that in 47 states, "nonconviction data cannot be disclosed at all for non-criminal justice purposes, or may be disclosed only in narrowly defined circumstances, for specified purposes").[10] Finally, the information at issue here is all less than (and probably quite a bit less than) ten years old,[11] unlike the *Reporters Committee* rap sheets that recorded a lifetime of everything from major crimes to youthful indiscretions.

The fact that information about these proceedings is readily available to the public reduces further still the incursion on privacy resulting from disclosure. In *Reporters Committee*, the

---

[10]The Justice Department insists that these distinctions are irrelevant. After all, it notes, "the information that the Court held had been properly protected" in *Reporters Committee* "related to a single individual, Charles Medico, who may or may not have actually been prosecuted," and "nowhere did the Court suggest that 'rap sheets' of individuals who had only been prosecuted on one occasion could not be withheld." DOJ Br. 24-25. But *Reporters Committee* considered rap sheets as "a categorical matter" -- "without regard to individual circumstances" -- and barred disclosure in the absence of a cognizable public interest because of "the practical obscurity" of their contents. 489 U.S. at 780. As noted in Part II.A.3 below, the factors that rendered rap sheet information practically obscure do not apply to the individual public prosecutions at issue in this case.

[11]The Justice Department compiled the list of docket information by asking U.S. Attorneys' Offices about applications for location data that were granted after September 12, 2001. Def.'s Statement of Material Facts Not in Dispute at 3 (App. 37); *see* Oral Arg. Recording 23:48-24:04. Since the docket information at issue here comes only from cases that subsequently led to indictments, and hence that had to have been filed after that date, and then only when the indictments led to pleas or convictions, which had to have come later still, it is likely that the information at issue relates to cases that are substantially less than ten years old.

Court recognized that "the extent of the protection accorded a privacy right at common law rested in part on the degree of dissemination of the allegedly private fact," and that "information may be classified as 'private' if it is . . . not freely available to the public." *Id.* at 763-64. It further noted that, although "one did not necessarily forfeit a privacy interest in matters made part of the public record, . . . the privacy interest [in such matters] was diminished." *Id.* at 764 n.15; *see id.* ("[T]he interests in privacy *fade* when the information involved already appears on the public record." (quoting *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 494-95 (1975)); *Bartholdi Cable Co. v. FCC*, 114 F.3d 274, 282 (D.C. Cir. 1997) (affirming agency's decision to release documents identifying individuals responsible for regulatory violations because their Exemption 6 privacy interests were "'minor' . . . given that these individuals have been identified in public documents filed with the Commission").

3. Of course, information that is technically public may be "practical[ly] obscur[e]." *Reporters Comm.*, 489 U.S. at 762, 780 (internal quotation marks omitted). *Reporters Committee* held that, in such circumstances, an individual's privacy interest in limiting disclosure or dissemination of information does not disappear just because it was once publicly released. *Id.* at 762-63, 780. But unlike the rap sheet information in *Reporters Committee*, the information at issue here is not practically obscure.

In *Reporters Committee*, the Court emphasized that there is an important "distinction, in terms of personal privacy, between scattered disclosure of the bits of information contained in a rap sheet and revelation of the rap sheet as a whole." *Id.* at 764; *see United States v. Maynard*, 615 F.3d 544, 561 (D.C. Cir. 2010). Indeed, the Court noted that "[t]he very fact that federal funds have been spent to prepare . . . these criminal-history files

15

demonstrates that [even] the individual items of information in the summaries would not otherwise be 'freely available' either to the officials who have access to the underlying files or to the general public." 489 U.S. at 764. What set rap sheets apart from other records implicating personal privacy, then, was "the compilation of otherwise hard-to-obtain information," including "information that would otherwise have surely been forgotten long before a person attains age 80, when the FBI's rap sheets are discarded." *Id.* at 764, 771. "Plainly," the Court said, "there is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in a single clearinghouse of information." *Id.* at 764. This conclusion, the Court declared, was further "supported by the web of federal [and state] statutory and regulatory provisions that limit[] the disclosure of rap-sheet information." *Id.* at 764-65.

In this case, however, disclosure will reveal only the "bits," not the "whole." As already discussed, the most that disclosure is likely to lead to is the fact of a single conviction, not a comprehensive scorecard of a person's entire criminal history across multiple jurisdictions. Nor is there a web of statutory or regulatory policies obscuring that information, nor much expense nor logistical difficulty in gathering it. To the contrary, computerized government services like PACER make it possible to access court filings concerning any federal defendant from the comfort of one's home or office, quite unlike the "diligent search of courthouse files, county archives, and local police stations throughout the country" that a citizen would have had to undertake to replicate the contents of a rap sheet, *Reporters Comm.*, 489 U.S. at 764. In addition, newspapers regularly report on federal prosecutions, and their accounts can easily be found on the internet. Indeed, by routinely issuing press releases that name the individuals that it has indicted, and then naming

them again when they plead guilty or are convicted, the Justice Department has itself made the process infinitely easier.[12]  If someone wants to know whether his neighbor or potential employee has been indicted for, convicted of, or pled guilty to a federal offense, he may well  find out by simply entering a Google search for that person's name.[13]  Nor is there the kind of temporal obscurity the Court found in *Reporters Committee*, where many of the incidents on the rap sheets, even if once public, "would otherwise have surely been forgotten." *Reporters Comm.*, 489 U.S. at 771.  As we have noted, the prosecutions at issue here are likely to have taken place considerably less than ten years ago.

We also disagree with the Department's suggestion that the disclosures sought here will draw renewed attention to individuals in a way that the initial disclosures did not.  It is little more than speculation to suggest that friends or associates who did not learn of a conviction at the time it occurred

---

[12]The Justice Department insists that "the fact that the government voluntarily chooses to inform the public of certain prosecutorial activities that it deems newsworthy does not mean that it is insensitive to the FOIA privacy interests of the individuals it prosecutes."  DOJ Reply Br. 4.  But no one is questioning the government's sensitivity. We point out the Department's press release practice not to pass judgment on it, but to show that it has further diminished whatever practical obscurity there might have been with respect to the names of indicted and convicted individuals.

[13]Google searches for variations of the phrase "the United States Attorney . . .  announced the indictment of," restricted to the last ten years, yield thousands of results.  The same is true of searches substituting "conviction" or "guilty plea" for "indictment."  A review of the first twenty pages of results for each such search shows that they consist primarily of news reports or press releases that identify the names and charged offenses of indicted or convicted individuals.

(whether through press accounts, press releases, or other means) will hear of it for the first time merely because the Justice Department releases a list of docket numbers, courts, and case names. *See Norton*, 309 F.3d at 34-35 (discounting the import of an asserted interference with personal privacy because the agency failed to show that such interference "[was] likely to occur"). Such a list is surely less likely to draw attention to a name than was the initial press coverage of an indictment and conviction. Nor are we persuaded that, when a person has already been publicly charged and convicted of a federal offense, disclosure of that person's name on a list of persons whose cell phones were tracked will materially increase the number of his or her possible future friends and associates who will be exposed to the information.[14]

The Justice Department maintains that the information the plaintiffs seek is practically obscure because they cannot identify the prosecutions in which they are interested without the government's assistance. But all that is practically obscure is information regarding the government's *policy* -- that is, which prosecutions involve the Department's use of warrantless cell phone tracking, and what the underlying records show about that policy. What is not obscure is information that raises issues of personal *privacy* -- that is, the fact that particular individuals have been convicted of or pled guilty to crimes. *Reporters Committee* was concerned solely about the latter; any interest in keeping the government's own policies obscure runs directly counter to FOIA's central purpose.

---

[14]This is not to discount the possibility that a FOIA request might be worded in such a way as to generate a list of convictions that, because of particularly stigmatic associations or otherwise, could draw special attention to the names on the list and so create heightened privacy concerns. But the government has made no such argument with respect to the list of docket information at issue in this case.

4. Finally, the Department calls our attention to a derivative use of the requested material that it regards as particularly harmful to privacy interests: the plaintiffs' suggestion that they may contact convicted "defendants and/or their counsel to determine whether [the] defendants ever learned that they were the targets of warrantless cell phone tracking." ACLU Reply Br. 24. There is no doubt that the courts have held that the risk of unwanted contact following a FOIA disclosure is a privacy interest that must be weighed in the privacy interest/public interest balance. *See Dep't of Defense v. FLRA*, 510 U.S. at 501; *Ray*, 502 U.S. at 176-77; *FLRA v. U.S. Dep't of the Treasury*, 884 F.2d 1446, 1452 (D.C. Cir. 1989); *NARFE v. Horner*, 879 F.2d 873, 878 (D.C. Cir. 1989). But in all of those cases, the intrusive contact likely to follow from disclosure was enormously greater than the relatively minimal potential contact at issue in this case.[15] Moreover, in each of those cases, the

---

[15]*See Dep't of Defense v. FLRA*, 510 U.S. at 501 (citing "the influx of union-related mail, and . . . telephone calls or visits," as well as contact by "commercial advertisers and solicitors," that would result from disclosure of agency employees' names and home addresses); *FLRA v. Dep't of the Treasury*, 884 F.2d at 1452 (citing the "unwanted barrage of mailings and personal solicitations" that would follow disclosure of federal employees' names and home addresses (internal quotation marks omitted)); *Horner*, 879 F.2d at 878 (noting that release of federal annuitants' names and addresses would subject them to a "barrage of solicitations . . . in the mail, over the telephone, and at the front door").

*Department of State v. Ray*, 502 U.S. at 175-77, offers a particularly instructive comparison. In that case, the requesters sought the government's unredacted summaries of interviews of unsuccessful Haitian asylum seekers. Those summaries contained not only the interviewees' names and addresses, but also "highly personal information regarding marital and employment status, children, living conditions and attempts to enter the United States." *Id.* at 175.

courts found that the privacy impact outweighed the public interest in disclosure because the public interest was either negligible or non-existent.[16] As we discuss in Subpart B below, the public interest in disclosure is substantially higher in this case and more than sufficient to tip the scales against the marginal privacy intrusion that could occur.

5. In sum, although the disclosure at issue here is sufficient to warrant consideration under Exemption 7(C) because it would compromise more than a de minimis privacy interest, it would

---

Moreover, because the interviewees had "left their homeland in violation of Haitian law[,] . . . the privacy interest in protecting these individuals from any retaliatory action that might result from a renewed interest in their aborted attempts to emigrate" had to be "given great weight." *Id.* at 176-77. On these bases, the Court concluded that "disclosure of the interviewees' names would be a significant invasion of their privacy because it would subject them to possible embarrassment and retaliatory action," and that the requesters' "intent to interview the returnees magnifie[d] the importance of maintaining the confidentiality of their identities." *Id.* at 177 & n.12.

[16]*Dep't of Defense v. FLRA*, 510 U.S. at 502 (finding that there was a "negligible FOIA-related public interest in disclosure" of agency employees' home addresses); *Ray*, 502 U.S. at 179 (finding that disclosure of the requested material would not provide, or lead to, "any relevant information that is not set forth in the documents that have already been produced," and that "[m]ere speculation about hypothetical public benefits cannot outweigh a demonstrably significant invasion of privacy"); *FLRA v. Dep't of the Treasury*, 884 F.2d at 1452 (noting that "[*Horner*] found the interest in disclosure [of retirees' names and addresses] to be absolute zero," and that the interest in disclosing the same information regarding current workers was only "modestly" higher).

not compromise much more.[17]  Neither the specific list actually at issue, nor information that might be derived from the docket information on that list, will disclose personal information that is not already publicly available and readily accessible to anyone who might be interested in it.  Nor will disclosure under FOIA make that information any more accessible than it already is through publicly available computerized databases.  At most, it will simply provide one more place in which a computerized search will find the same person's name and conviction -- and even that is only on the assumption that someone takes the docket information from the list, looks up the underlying cases, and then puts that underlying information on the internet.

B

On the other side of the balance, we find a significant public interest in disclosure, something altogether absent in *Reporters Committee*.  Because the disclosure of private citizens' criminal histories "reveals little or nothing about [the] agency's own conduct," and because that was all that was at issue in *Reporters Committee*, the "public interest in disclosure [was] at its nadir" in that case.  *Reporters Comm.*, 489 U.S. at 773, 780.  By contrast, as we discuss below, the disclosure of prosecutions in which the defendants were subject to warrantless cell phone tracking, and then were convicted or pled guilty, would shed light on government conduct.  Accordingly, it falls within FOIA's scope because it advances "the citizens' right to be

---

[17]*Cf. Multi Ag Media, LLC v. Dep't of Agric.*, 515 F.3d 1224, 1229 (D.C. Cir. 2008) ("The balancing analysis for FOIA Exemption 6 requires that we first determine whether disclosure of the files 'would compromise a substantial, as opposed to *de minimis*, privacy interest,' because '[i]f no significant privacy interest is implicated, . . . FOIA demands disclosure.'" (quoting *Horner*, 879 F.2d at 874)).

informed about what their government is up to." *Reporters Comm.*, 489 U.S. at 773 (internal quotation marks omitted).

1. The use of and justification for warrantless cell phone tracking is a topic of considerable public interest: it has received widespread media attention[18] and has been a focus of inquiry in several congressional hearings considering, among other things, whether the Electronic Communications Privacy Act of 1986, Pub. L. No. 99-508, 100 Stat. 1848 (1986), should be revised either to limit or to facilitate the practice.[19] Courts

---

[18]*See, e.g.*, Adam Cohen, *What Your Cell Phone Could Be Telling the Government*, TIME, Sept. 15, 2010; Editorial, *Should Police Use Your Cellphone to Track You?*, DENVER POST, June 27, 2010, at D3; *PBS Newshour: With Location-Tracking Technology, Cell Users Paying Price of Privacy* (television broadcast June 22, 2010), transcript available at http://www.pbs.org/newshour/ bb/science/ an-june10/ cell_06-22.html; Steve Chapman, *Big Brother in Your Cell*, CHI. TRIB., Apr. 1, 2010, at 17; Miguel Helft, *Technology Coalition Seeks Stronger Privacy Laws*, N.Y. TIMES, Mar. 31, 2010, at B1; Michael Isikoff, *The Snitch in Your Pocket*, NEWSWEEK, Mar. 1, 2010, at 40; Ellen Nakashima, *Judges Urge Standard Cellphone-Tracking Policy*, WASH. POST, Nov. 14, 2008; Ellen Nakashima, *Cellphone Tracking Powers on Request*, WASH. POST, Nov. 23, 2007, at A1; Orin Kerr, *Applying the Mosaic Theory of the Fourth Amendment to Disclosure of Stored Records*, THE VOLOKH CONSPIRACY (Apr. 5, 2011, 4:54 PM), http://volokh.com/2011/04/05/.

[19]*See, e.g.*, *The Electronic Communications Privacy Act: Promoting Security and Protecting Privacy in the Digital Age: Hearing Before the S. Judiciary Comm.*, 111th Cong. (2010); *ECPA Reform and the Revolution in Location Based Technologies and Services: Hearing Before the Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the H. Comm. on the Judiciary*, 111th Cong. (2010); *The Collection and Use of Location Information for Commercial Purposes: Hearing Before the Subcomm. on Commerce, Trade, and Consumer Protection and the Subcomm. on Commc'ns,*

are divided as to whether the government must show probable cause before it can obtain cell phone location data,[20] as well as on related questions regarding warrantless GPS surveillance.[21]

---

*Tech., and the Internet of the H. Comm. on Energy & Commerce*, 111th Cong. (2010).

[20]*Compare In re Application of U.S. for an Order . . . Authorizing Disclosure of Location-Based Servs.*, 727 F. Supp. 2d 571 (W.D. Tex. 2010), *In re Applications of U.S. for Orders Authorizing Disclosure of Cell Site Info.*, Nos. 05-403 et al., 2005 WL 3658531 (D.D.C. Oct. 26, 2005), *In re Application of U.S. for an Order . . . Authorizing Release of Subscriber Info. and/or Cell Site Info.*, 396 F. Supp. 2d 294 (E.D.N.Y. 2005), *and In re Application for Pen Register & Trap/Trace Device with Cell Site Location Authority*, 396 F. Supp. 2d 747 (S.D. Tex. 2005), *with In re Application of U.S. for Order Directing Provider of Elec. Commc'n Serv. to Disclose Records to Gov't*, 620 F.3d 304, 318 (3d Cir. 2010), *United States v. Forest*, 355 F.3d 942, 950-52 (6th Cir. 2004), *vacated on other grounds*, 543 U.S. 1100 (2005), *In re Application of U.S. for an Order Authorizing Use of Two Pen Register & Trap & Trace Devices*, 632 F. Supp. 2d 202 (E.D.N.Y. 2008), *In re Application of U.S. for an Order for Prospective Cell Site Location Info. on a Certain Cellular Telephone*, 460 F. Supp. 2d 448 (S.D.N.Y. 2006), *In re Application of U.S. for an Order . . . Authorizing Release of Subscriber Info. and/or Cell Site Info.*, 411 F. Supp. 2d 678 (W.D. La. 2006), *and In re Application of U.S. for an Order for Disclosure of Telecommc'ns Records & Authorizing Use of Pen Register & Trap & Trace*, 405 F. Supp. 2d 435 (S.D.N.Y. 2005).

[21]*Compare Maynard*, 615 F.3d at 563-67 (holding that a warrant was required to use a GPS device to monitor the defendant's vehicle for a month), *with United States v. Marquez*, 605 F.3d 604, 609-10 (8th Cir. 2010) (holding that a warrant was not required to install a GPS tracking device on the defendant's vehicle for a reasonable period of time), *United States v. Pineda-Moreno*, 591 F.3d 1212, 1216-17 (9th Cir. 2010) (holding that use of a GPS device to track the defendant's vehicle over a four-month period did not violate the

The Supreme Court has recently granted certiorari to address the GPS issue. *See United States v. Jones*, 2011 WL 1456728 (June 27, 2011), *granting cert. to Maynard*, 615 F.3d 544.

The disclosure sought by the plaintiffs would inform this ongoing public policy discussion by shedding light on the scope and effectiveness of cell phone tracking as a law enforcement tool. It would, for example, provide information about the kinds of crimes the government uses cell phone tracking data to investigate. As the plaintiffs note, with respect to wiretapping Congress has balanced privacy interests with law enforcement needs by permitting the government to use that technique for only the more serious offenses, *see* 18 U.S.C. § 2516, and the plaintiffs (and others) may decide to argue for similar legislation to govern cell phone tracking. Disclosure would also provide information regarding how often prosecutions against people who have been tracked are successful, thus shedding some light on the efficacy of the technique and whether pursuing it is worthwhile in light of the privacy implications. Information from suppression hearings in these cases could provide further insight regarding the efficacy of the technique by revealing whether courts suppress its fruits, and would disclose the standard or standards the government uses to justify warrantless tracking. Information from suppression hearings would also provide facts regarding the duration of tracking and the quality of tracking data, facts that would inform the public discussion concerning the intrusiveness of this investigative tool.

There are obviously many caveats about the value of the information that might be derived from the requested disclosure.

Fourth Amendment), *and United States v. Garcia*, 474 F.3d 994, 996-98 (7th Cir. 2007) (holding that a warrant was not required to conduct continuous electronic tracking of the defendant's vehicle using a GPS device).

For example, defendants may have been charged with lesser offenses than the ones upon which the tracking was originally predicated, thus making it appear that the technique was used for less serious crimes than was actually the case. And for a host of other reasons, the sample of prosecutions at issue here may be unrepresentative of the Justice Department's overall practice. But the fact that the data will not be perfect does not mean that there is no public interest in their disclosure.

Nor are we persuaded by the government's contention that the interest in informing the public discussion is deficient because the plaintiffs have insufficient evidence that disclosure will show government wrongdoing. Whether the government's tracking policy is legal or illegal, proper or improper, is irrelevant to this case. It is true that, where "the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure." *Favish*, 541 U.S. at 174. But the plaintiffs are not (or at least not only) seeking to show that the government's tracking policy is legally improper,[22] but rather to show what that policy is and how effective or intrusive it is. "[M]atters of substantive law enforcement policy . . . are properly the subject of public concern," whether or not the policy in question is lawful. *Reporters Comm.*, 489 U.S. at 766 n.18.

Finally, the Justice Department contends that the incremental contribution of disclosure to the public interest is negligible "given the extensive public attention that this issue is already receiving." DOJ Br. 32. This is nothing more than a Catch-22 argument: if public attention were not already

---

[22]That distinguishes this case from cases like our recent decision in *Blackwell v. FBI*, 2011 WL 2600831 (D.C. Cir. July 1, 2011).

focused, the government would argue that shows there is no public interest in disclosure; because there is public attention, it argues that no more is needed.[23] But there is no doubt that much of the information the plaintiffs seek to develop from the FOIA disclosure here -- the connection between tracking applications and actual prosecutions -- is not currently in the public domain. For the reasons stated above, there is also no doubt that the information interested parties can derive from that connection will yield further information about the government's policy that is not now readily available. The fact that the public already has some information does not mean that more will not advance the public interest.

2. The Department protests that, because any benefit to the public interest accrues from derivative use of the docket information and not from that information itself, that benefit cannot be considered as part of the public interest analysis. And it is true that the case names and docket numbers standing alone generate no public benefit; only through derivative uses can information valuable to the public be obtained. But this court takes derivative uses into account in evaluating the impact of disclosure on the public interest,[24] just as both this court and the

---

[23]*See* JOSEPH HELLER, CATCH-22, at 46 (paperback ed. 2004) ("There was only one catch and that was Catch-22, which specified that a concern for one's own safety in the face of dangers that were real and immediate was the process of a rational mind. Orr was crazy and could be grounded. All he had to do was ask; and as soon as he did, he would no longer be crazy and would have to fly more missions. . . . Yossarian was moved very deeply by the absolute simplicity of this clause of Catch-22 and let out a respectful whistle. 'That's some catch, that Catch-22,' he observed.").

[24]For example, in *Multi Ag Media LLC v. Department of Agriculture*, 515 F.3d 1224 (D.C. Cir. 2008), the court rejected the agency's contention that disclosure of information from its database

Supreme Court do in evaluating the impact of disclosure on personal privacy.[25]

The government claims that "the Supreme Court has questioned but not decided whether . . . a 'derivative use' theory is valid." DOJ Br. 38 n.4 (citing *Ray*, 502 U.S. 164). But this is only half true. In *Ray*, it was the *government*, not the Court, that did the questioning: "The Government," the Court reported, "argues that we should adopt a categorical rule entirely excluding the interest in such use from the process of balancing." 502 U.S. at 178. For itself, however, the Court said nothing more than this: "There is no need to adopt such a rigid

_____

of farm data would "say[] nothing about how the agency administers its programs," because "[w]ith the information from the database, the public can more easily determine whether USDA is catching cheaters and lawfully administering its subsidy and benefit programs." *Id.* at 1232. In *Getman v. NLRB*, 450 F.2d 670 (D.C. Cir. 1971), we held that disclosing certain names and addresses of employees would serve the public interest by facilitating interviews for an academic study. We likewise considered derivative uses in *Painting and Drywall Work Preservation Fund, Inc. v. Department of Housing and Urban Development*, 936 F.2d 1300 (D.C. Cir. 1991), and *FLRA v. Department of the Treasury*, 884 F.2d 1446, although we ultimately concluded in both that the public interest in disclosure was too minor to outweigh the privacy interests at issue. *See Painting & Drywall Work Pres. Fund*, 936 F.2d at 1303 (noting that "a relevant public interest could exist where 'the names of current workers might provide leads for an investigative reporter seeking to ferret out what government is up to,'" but finding that there was an alternative way to obtain the information and that FOIA disclosure did not offer a significant enough advantage to "outweigh the . . . workers' significant privacy interest" (quoting *FLRA v. Dep't of the Treasury*, 884 F.2d at 1452 (internal quotation marks omitted))).

[25]See cases cited *supra* note 6. As we discuss in the text that follows, the two kinds of derivative use go hand in glove.

rule to decide this case . . . . Accordingly, we need not address the question whether a 'derivative use' theory would ever justify release of information about private individuals." *Id.* at 178-79. It thus left this court's own case law on the issue intact.[26]

Moreover, the derivative use issue gives the Justice Department a Catch-22 headache of its own. The Department correctly notes that Justice Scalia, in his opinion concurring in the judgment in *Ray*, "opined that such 'derivative use' 'to establish a public interest' is improper under FOIA." DOJ Br. 38 n.4 (quoting *Ray*, 502 U.S. at 180-81 (Scalia, J., concurring

---

[26]The Justice Department also urges that, in evaluating the public interest, we may not consider the plaintiffs' contemplated derivative uses because it is "well settled that the 'identity of the requesting party' and the 'purposes for which the request for information is made' have 'no bearing' on whether such information must be disclosed under FOIA." DOJ Br. 35 (quoting *Dep't of Defense v. FLRA*, 510 U.S. at 496 (quoting *Reporters Comm.*, 489 U.S. at 771)). But the quoted cases do not hold that derivative use may not be considered where -- as here -- such use (by the requester or anyone else) will further FOIA's purpose of shedding light on the operations and activities of government. Rather, they hold that the rights of all requesters are equal and that a requester's parochial interests -- if unrelated to FOIA's purpose -- may not be considered. *See Reporters Comm.*, 489 U.S. at 771 ("[T]he rights of the two press respondents in this case are no different from those that might be asserted by any other third party, such as a neighbor or prospective employer[, because,] [a]s we have repeatedly stated, Congress clearly intended the FOIA to give any member of the public as much right to disclosure as one with a special interest" in a particular document. (internal quotation marks omitted)); *Dep't of Defense v. FLRA*, 510 U.S. at 497 (holding that, although the requesting unions' interest in obtaining the home addresses of agency employees "might allow the unions to communicate more effectively with employees, . . . it would not appreciably further the citizens' right to be informed about what their government is up to" (internal quotation marks omitted)).

in part and concurring in the judgment)). But the Department neglects to mention the remainder of Justice Scalia's analysis: "[D]erivative use on the public-benefits side, and derivative use on the personal-privacy side must surely go together." 502 U.S. at 181. "[T]here is no plausible reason," he said, "to allow it for the one and bar it for the other." *Id.*

Accordingly, even under the authority the government cites, if we may not consider derivative use in determining the impact of disclosure on the public interest side, we also may not consider it in determining disclosure's impact on privacy interests. And without derivative use, the Department would fail to meet the threshold for invoking Exemption 7(C) at all. If we do not consider the possibility that the plaintiffs or others will follow the path from the list of docket information to the underlying court records, the only question left is whether there is any privacy interest in a list of docket numbers, case names, and courts. Of these, only uncommon names (e.g., *United States v. Merrick Garland*, rather than *United States v. John Smith*) would have any chance at all of identifying particular individuals, and the district court could eliminate even that possibility by redacting the names. That would still leave the plaintiffs with all they need (the docket number and court) to pursue their planned derivative use, but it would extinguish any privacy interest. And if there is no privacy interest, Exemption 7(C) simply does not apply. Perhaps for this reason, the Department acknowledged at oral argument that, if we consider derivative use for evaluating privacy concerns, we must do the same for the public interest. *See* Oral Arg. Recording 27:16-:37.

In sum, because disclosure of the information considered in this Part would "shed[] light on [the government's] performance of its statutory duties," it "falls squarely within [FOIA's] statutory purpose." *Reporters Comm.*, 489 U.S. at 773. And in light of the strength of the public interest in disclosure and the

relative weakness of the privacy interests at stake, we conclude that production of the requested information will not constitute an "unwarranted" invasion of personal privacy under Exemption 7(C).

## III

In this Part, we consider the plaintiffs' challenge to the district court's refusal to direct the government to produce: (A) the list of docket information for criminal cases in which the defendants were acquitted, or for cases that were dismissed or sealed (and remain under seal); and (B) the case name in the "Draft Application" (Document 22), and the docket numbers in both that document and the "Template Application" (Document 29). As to both, we conclude that a remand for further development of the record is in order.

## A

In balancing the public and private interests implicated by disclosure of the Department's list of docket information, the district court found dispositive the distinction between indictments resulting in convictions or guilty pleas, and those resulting in acquittals or dismissals, or cases that remain sealed. As we noted in Part II, this distinction makes some intuitive sense, as both parties agree that the disclosure of information regarding acquittals, dismissal of charges, or sealed cases raises greater privacy concerns than the disclosure of information regarding public convictions or public pleas. *See* ACLU Reply Br. 11; DOJ Br. 19; Oral Arg. Recording 38:10 (agreement by plaintiffs' counsel that there is a distinction between the privacy interest implicated by disclosure of convictions and public guilty pleas and that implicated by disclosure of acquittals and dismissals). But whether that is enough of a distinction to

justify withholding under Exemption 7(C) is a harder question. It is a question we need not answer today.

The plaintiffs acknowledge that:

> This case is in an odd posture because neither party argued below that the district court should split the difference by withholding some docket information and disclosing other docket information. The district court *sua sponte* devised its distinction between cases ending in conviction or guilty pleas and cases resulting in acquittal or dismissal or that remain sealed.

ACLU Reply Br. 3 n.3. As a consequence, the record does not reveal whether there are any cases that fall into the latter category. At oral argument, neither party could tell us whether there are any, and the Justice Department acknowledged that it is possible there are none. *See* Oral Arg. Recording 22:10.

Rather than attempt to resolve a question that may turn out to be purely academic, we conclude that the better course is to vacate this portion of the district court's decision and remand the case for that court to determine whether any of the docket numbers refer to cases in which the defendants were acquitted, or to cases that were dismissed or sealed (and remain sealed). The court may develop this information by requiring affidavits of the government or additional entries in the government's *Vaughn* index. *See* Oral Arg. Recording 22:57 (acknowledgment by government counsel that the district court may resolve the question by insisting on a more detailed *Vaughn* index that would indicate the status of the cases). Needless to say, if there are no such cases, that will resolve this particular request.

B

The plaintiffs also seek disclosure of the docket number and case name (with personally identifiable information redacted) of one application to engage in warrantless cell phone tracking that the government withheld in full (Document 22), and the docket number of another application that the government produced in partially redacted form (Document 29). The plaintiffs intend to use this information to locate the applications and the underlying case files, and to move to unseal them if they are currently sealed. ACLU Br. 32. The district court was concerned that, among other things, this disclosure "could reveal surveillance targets yet to be prosecuted, . . . either because the cases are not actually sealed, or because the plaintiffs' promised motion to unseal could be successful." *ACLU*, 698 F. Supp. 2d at 167.

Once again, the record is inadequate to resolve this issue. The *Vaughn* index labels the documents as, respectively, a "Draft Application" and a "Template Application," which suggests they are internal drafts containing information that may be covered by the deliberative-process or work-product privileges cognizable under FOIA Exemption 5, 5 U.S.C. § 552(b)(5). *See Rockwell Int'l Corp. v. U.S. Dep't of Justice*, 235 F.3d 598, 601 (D.C. Cir. 2001). Indeed, although the district court did not address Exemption 5, the Justice Department asserted that exemption in the district court and mentions the exemption in its appellate brief. *See* DOJ Br. 43 n.6. The plaintiffs counter that the fact that each document bears a docket number "suggest[s] that it was likely filed with a court," and hence does not constitute work product. ACLU Br. 30. When asked at oral argument, however, Department counsel stated that the status of both documents is unclear, and that he did not know whether either application was ever filed in court. *See* Oral Arg. Recording 34:20-35:36.

The plaintiffs' appellate briefs do not argue for disclosure of documents that are merely drafts or templates. They ask only for disclosure of docket information in "cases in which prosecutors *filed* an application for warrantless cell phone location tracking." ACLU Br. 12 (emphasis added). Accordingly, if neither Document 22 nor Document 29 fits that description, this issue, too, will resolve itself.

But even if the applications were filed, we do not know whether they relate to pre-indictment investigations or to cases that have already been indicted. Nor do we know whether, even if the latter, there are still ongoing investigations regarding other targets of the applications. Indeed, the district court worried that disclosure could "lead to release of personally identifiable information about surveillance targets who have yet to be prosecuted." *ACLU*, 698 F. Supp. 2d at 166. These distinctions may be significant and may, depending on the facts, warrant withholding under (inter alia) Exemption 7(A) -- as law enforcement records, the disclosure of which "could reasonably be expected to interfere with enforcement proceedings," 5 U.S.C. § 552(b)(7)(A). The government asserted this exemption in the district court as well.

Nor do we know whether, if filed, the applications are currently under seal. *See* ACLU Reply Br. 35 ("Plaintiffs have no way of determining whether the docket numbers correspond to sealed cases or whether the targets were indicted."). The district court thought there was a possibility that "the cases are not actually sealed." *ACLU*, 696 F. Supp. 2d at 167.[27] This raises still further problems, including the possibility that following the docket information could lead the plaintiffs or

---

[27]As we have noted, the district court was also concerned that, even if sealed, "the ACLU's promised motion to unseal could be successful." *ACLU*, 698 F. Supp. 2d at 167.

others to applications that disclose not only the identities of convicted defendants, but also of acquitted or uncharged third parties. As we noted above, it is one thing to disclose the identities of targets who were eventually convicted in public proceedings; but the privacy calculus becomes increasingly more significant if disclosure extends to those who were acquitted, or to those whose activities were never the focus of public attention, such as uncharged investigative subjects, witnesses, or bystanders. *Cf. Favish*, 541 U.S. at 166 (noting that "[t]here is special reason" to protect data regarding "persons interviewed as witnesses or initial suspects" as "to which the public does not have a general right of access in the ordinary course"); *Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 666 (D.C. Cir. 2003) (holding that "persons involved in law enforcement investigations -- witnesses, informants, and the investigating agents -- have a substantial interest in seeing that their participation remains secret" (internal quotation marks omitted)).

In their reply brief, the plaintiffs suggest that "[i]f anything hinges on the characterization of the record, this Court should remand to the district court for consideration in the first instance." ACLU Reply Br. 35 n.12. Because we think quite a lot may hinge on the record, we accept this suggestion. We will vacate and remand this portion of the district court's decision as well, and direct the court to determine the status of the two withheld documents with respect to the distinctions described above. The court may develop this information by requiring affidavits of the government or additional entries in the *Vaughn* index, or by in camera examination of the underlying documents. *See Mays v. DEA*, 234 F.3d 1324, 1328 (D.C. Cir. 2000) (remanding where the *Vaughn* index was insufficient for the court to tell "whether and to what extent release of the 'investigative details' [to which the index] referred . . . would reveal the identity or otherwise implicate the privacy interests of

any third party," and noting that on remand "the district court may review the disputed documents in camera in order to make this determination").

IV

One final note. At oral argument, Justice Department counsel suggested that, rather than producing the requested documents, the Department might be able to provide the plaintiffs with more of the data they are really interested in without disclosing information that could intrude upon personal privacy. This might include, counsel suggested, information such as the nature of the charges in all 255 cases on the government's list, whether suppression motions were filed in those cases, and the outcome of both the motions and the prosecutions. *See* Oral Arg. Recording 22:15-:33; 29:46-31:28.

This is an interesting offer, in part because it could require the Department to provide certain information -- by using the docket information and PACER to find the underlying documents, and then extracting information from those documents and creating a summary document -- that the plaintiffs might not be able to obtain through a FOIA request. *See Forsham v. Harris*, 445 U.S. 169, 186 (1980) (noting that FOIA does not "impose[] [any] duty on the agency to create records"). As such, it might provide the basis for a settlement of this case. But it is not a suggestion that we can consider on this appeal. Among other things, it was raised neither in the Department's appellate briefs nor -- to the best of our knowledge -- in the district court proceedings.

V

We affirm that portion of the district court's decision directing disclosure of docket information from criminal cases

in which the government prosecuted individuals after judges granted applications for cell phone location data without determining probable cause, and in which those individuals were ultimately convicted or entered public guilty pleas. We vacate and remand the remainder of the district court's decision for that court to develop the factual information discussed in Part III above and, thereafter, to reconsider the appropriate disposition of the remaining aspects of the case.

*So ordered.*