AMERICAN CIVIL LIBERTIES UN-ION and American Civil Liberties Union Foundation, Plaintiffs,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY and U.S. Immigration and Customs Enforcement, Defendants.

No. 11 Civ. 3786(RMB).

United States District Court, S.D. New York.

Sept. 9, 2013.

**308**

Richard Guy Leland, Jennifer L. Colyer, Fried, Frank, Harris, Shriver & Jacobson, Judy Rabinovitz, American Civil Liberties Union Foundation, Udi Ofer, New York Civil Liberties Union, New York, NY, Justin Cox, ACLU Immigrants' Rights Project, Atlanta, GA, Michael Thomas Tan,

ACLU Immigrants' Rights Project, San Francisco, CA, for Plaintiffs.

Louis Anthony Pellegrino, U.S. Attorney Office, New York, NY, for Defendants.

## DECISION & ORDER

RICHARD M. BERMAN, District Judge.

### I. Introduction

On June 3, 2011, the American Civil Liberties Union and the American Civil Liberties Union Foundation (collectively, "Plaintiffs" or "ACLU") filed a complaint against the United States Department of Homeland Security ("DHS") and the United States Immigration and Customs Enforcement ("ICE") (collectively, "Defendants" or "Government") pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"). Plaintiffs seek to compel the Defendants to produce information relating to non-American detainees awaiting removal from the United States who have been held for more than ninety days and detainees who have been held for more than six months. (Complaint, dated June 3, 2011, ¶ 2.) Plaintiffs are also seeking information related to detainees released from ICE custody following periods of detention of ninety days or more. *Id.* ¶ 12.

It is ACLU's contention that detainees are being subjected to "prolonged immigration detention—for months, if not years—without adequate procedures in place to determine whether their detention is justified" and that detention may not be in compliance with the regulatory, statutory, and constitutional limits, including those established by the United States Supreme Court in *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001).[1] *Id.* ¶¶ 2, 3.

---

1. The *Zadvydas* Court held that "an alien may be held in confinement until it has been deter-
mined that there is no significant likelihood of removal in the reasonably foreseeable future"

Following a series of letters to the Court (dated January 4, 2012, February 17, 2012, and March 30, 2012) advising that the parties were attempting to narrow the disclosure issues being disputed and a series of court conferences (on April 3, 2012 and September 6, 2012), the parties agreed to a Stipulation and Order of Settlement and Partial Dismissal, dated September 6, 2012 ("Stipulation"). (Def.'s Mem. of Law in Supp. of Pl.'s Mot. for Summ. J., dated May 17, 2013 ("Def. Mem."), at 4.; Pl. Mem. at 4.) The Stipulation states that "all issues in this case have been resolved, except for a legal dispute arising from the assertion of certain FOIA exemptions ... which will require resolution of cross-motions for summary judgment before any production can commence regarding those documents." (Stipulation, dated Sep. 6, 2013, at 2.) [2]

■ The Stipulation also required Defendants to produce a sample redacted detainee file (and a so-called *Vaughn* Index related to the sample file) [3] detailing and justifying the FOIA exemptions ICE was relying upon for redacting information relating to detainees.[4] (Stipulation ¶ 6.) The redactions reflected in the sample detainee file relate to administrative review of (continued) custody of an alien after 90 and 180 days. These files are referred to herein as "POCR Files." (Def. Mem. at 1.) "Each POCR 'file' represents a singular case file for a specific detained foreign national." *Id.*

■ The sum and substance of the parties' (remaining) dispute (*i.e.* following the Stipulation) relates to (34) redactions in the sample POCR File based upon FOIA Exemptions 5, 6 and 7(C), and 7(E), 5 U.S.C. § 552(b)(5), (b)(6), (b)(7)(C), (b)(7)(E), respectively. (Pl. Mem. at 5.) [5]

and also determined that immigration detention lasting longer than six months is presumed to be unconstitutional. 533 U.S. at 701, 121 S.Ct. 2491.

2. The parties confirmed this procedure to the Court at a conference held on September 3, 2013. (*See* Hr'g Tr., dated Sep. 3, 2013 (THE COURT: "I want to just make sure that this exercise is intended to be definitive, at least at the district court level, and at least in the legal sense. And what you're each saying is that you believe that to be the case." AUSA PELLEGRINO: "I think that's correct your Honor.").)

3. A *Vaughn* Index is a document prepared in FOIA cases to justify each withholding of information under a FOIA exemption. *See Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir. 1973). A *Vaughn* index should provide "information that is ... specific enough to obviate the need for an *in camera* review." *Halpern v. FBI,* 181 F.3d 279, 294 (2d Cir.1999).

4. The Stipulation also narrowed the scope of the ACLU's remaining FOIA requests to the following:
 1. The review document(s) prepared in deciding whether individual(s) should be re-

leased after 90–days of detention, 8 C.F.R. § 241.4.
 2. The review document(s) prepared in deciding whether individual(s) should be released after six months, 8 C.F.R. § 241.14.
 3. Any other review notices or decisions relating to 90 and 180–day reviews.
 4. Any other worksheets relating to 90 and 180–day reviews.
 5. Notices provided to detainees who are found to have failed to cooperate with the Government's removal efforts, 8 C.F.R. § 241.4(g)(1)(H).
 (Pl. Mem. at 4.)

5. FOIA litigation privileges exemption 5 ("**Exemption 5**") permits the withholding of inter—and intra-agency information that is normally privileged in the civil discovery context, such as information protected by the deliberative process, attorney-client relationship, or attorney work product privilege. 5 U.S.C. § 552(b)(5); Amend. Decl. of Ryan Law in Supp. of Def.'s Mot. for Summ. J., dated May 17, 2013 ("Amend. Law Decl."), ¶ 12. The deliberative process privilege covers pre-decisional expressions of opinion on legal policy matters such as recommendations made within agencies and by agencies to the President. *See* Department of Justice, *Freedom of Infor-*

The parties have not yet identified the number of individual records—beyond the sample POCR File—that may ultimately be produced. (12/20/12 Tr. at 8:25–9:7 (THE COURT: "[W]hat's the universe of people we're talking about numerically, roughly?" AUSA PELLEGRINO: ... "We left open the question of how large the potential universe would be pending your Honor's resolution of this dispute because we weren't sure just how onerous the searching would be."); 10:14–21 (THE COURT: "Do you have a thought yourself as the plaintiff, let's say if you are successful, what kind of universe of people would—" Plaintiffs' Counsel TISDALE: "We would have to consult with our clients about that because ... they're more in tune with the objectives and the goals that they will need to achieve with this data.").)

On February 17, 2013, Plaintiffs filed a motion for summary judgment seeking a declaration "that certain exemptions to FOIA [i.e. 5, 6, 7(C), 7(E)] asserted by Defendants are inapplicable and that Plaintiffs are entitled under the law to production of the [unredacted] records...." (Pl. Mem. at 1.) Plaintiffs contend that (1) the so-called deliberative process privilege (*see* note 5, *infra*) does not apply because "[t]he documents that Plaintiffs seek here do not go to policy formulation at all; they go to whether the Defendants are following their own regulations in their day-to-day interactions with de-

tainees"; (2) the privacy exemptions are inapplicable because no personal identifying information is being sought by the ACLU and "[e]ven if a measurable interest in privacy exists here, it is outweighed by the public's interest in disclosure"; and (3) the law enforcement information exemption is inapplicable because "Defendants have not met their threshold burden of explaining how the release of information would disclose techniques and procedures for law enforcement investigations." "The disputed data points are neither 'techniques,' 'procedures' nor 'guidelines' that the law enforcement information exemption can protect from disclosure." *Id.* at 8, 11, 13, 19.

On May 17, 2013, Defendants filed an opposition to Plaintiffs' motion for summary judgment (and a cross motion for summary judgment) contending that Defendants' proposed withholdings are "proper" pursuant to FOIA. (Def. Mem. at 1.) The Government states that (1) it is asserting Exemption 5 in order to "preserv[e] its right to redact deliberative process items from any future POCR 'file' production." The Government "largely agrees with Plaintiffs' expression of the parameters of [the deliberative process exemption], and therefore there may not be any controversy for the Court to resolve concerning the Government's invocation of Exemption 5";[6] (2) ICE properly redacted

---

mation Act Guide* (May, 2004), http://www. justice.gov/oip/exemption5.htm (last visited Aug. 29, 2013).

FOIA's privacy exemptions 6 and 7(c) ("**Exemption 6**" and "**Exemption 7(C)**" respectively) permit the withholding of documents the production of which "would constitute a[n] unwarranted invasion of personal privacy." 5 U.S.C. §§ 552(b)(6), (7)(C); Amend. Law Decl. ¶ 12.

FOIA's law enforcement information exemption 7(E) ("**Exemption 7(E)**") permits the withholding of information which would dis-

close techniques and procedures for law enforcement investigations and prosecutions and could be expected to risk circumvention of the law. 5 U.S.C. § 552(b)(7)(E); Amend. Law Decl. ¶¶ 26–27.

**6.** Plaintiffs' memoranda of law, dated February 27, 2013 and June 14, 2013, addressed only the deliberative process privilege with respect to Exemption 5, presumably because the Government asserted in its *Vaughn* Index that the Exemption 5 information in the sample was being withheld only on the basis of

information on the basis of the privacy exemptions because the information in dispute "is so collectively unique that even without a name or alien number [which have not been sought by Plaintiff], it is still a personally identifying characteristic." And, "Plaintiffs cannot establish that the disclosure of the redacted information in the POCR files would shed any additional light on the Government's conduct of its obligation [to release detainees] . . . or that the [information] in the files will spark debate . . . in a way that is sufficient to merit the public disclosure of the wealth of [information] in ICE's POCR files"; and (3) the Government properly redacted the sample file on the basis of the law enforcement information exemption because "if [the redacted] information were revealed, it would demonstrate how law enforcement officers weigh the factors in conducting POCR reviews." (Def. Mem. at 17, 21, 22, 24 (internal quotations omitted).)

## II. Background

When an individual is determined to be in the United States illegally and is ordered removed from the United States, ICE places that individual in administrative detention, often until the person is actually removed. (Amend. Decl. of Ryan Law in Supp. of Def.'s Mot. for Summ. J., dated May 17, 2013 ("Second Law Decl."), ¶ 5.) ICE works to obtain travel documents from that individual's home country to effectuate the removal. *Id.* ¶ 6. "In general . . . when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days . . . (referred to as the 'removal period')." 8 C.F.R. § 241(a)(1)(A). "During this [90–day] removal period, the Attorney General shall detain the alien." *Id.* § 241(a)(2); 8 U.S.C. § 1231(a)(2).

In a May 2004 study, the United States General Accounting Office found that "ICE does not have information that provides assurance that its custody reviews [of detainees] are timely and its custody determinations are consistent with the [the law] and implementation regulations." (Complaint, Ex. B., General Accounting Office, "Immigration Enforcement: Better Data and Controls Are Needed to Assure Consistency with the Supreme Court Decision on Long–Term Alien Detention, "GA–04–434 (May 2004)".) In a February 9, 2007 report, the Department of Homeland Security Office of Inspector General ("OIG") determined, among other things, that "required custody decisions were not made in over 6% of cases, and were not timely in over 19% of cases." (Complaint, Ex. C, DHS Office of Inspector General, "ICE's Compliance with Detention Limits for Aliens with a Final Order of Removal from the United States," OIG–07–28 ("OIG Report"), at 1 (Feb.2007).) The OIG Report recommended "holding ICE field officers more accountable for the quality and timeliness of the POCR process while also increasing ICE headquarters assistance in obtaining travel documents; prioritizing the removal of aliens who represent a serious threat to society or the public interest; developing an objective and transparent methodology for evaluating the likelihood of removal for all cases; and intensifying the monitoring of long-term detainees." *Id.* at 2.

Prior to filing its Complaint, on January 13, 2009, the ACLU submitted a FOIA request to ICE and DHS ("First FOIA Request") for records relating to the procedures used by the Government to determine whether to continue to detain or to release detainees held for more than six months. (Pl. Mem. at 3.) On September 30, 2009, Defendants responded to the

---

the deliberative process privilege. (*See* Def. Mem. at 21; pp. 313–14, *infra.*)

First FOIA Request by producing approximately 742 pages of documents, roughly one third of which contained redactions. (Complaint ¶ 6); Complaint, Ex. G, Letter from ICE FOIA Officer Catrina Pavlik–Keenan ("Pavlik–Keenan" to ACLU Immigrant Right's Project Attorney Judy Rabinovitz ("Rabinovitz"), dated September 30, 2009, at 1 (ICE "determined that portions of [were] exempt from disclosure pursuant to FOIA Exemptions . . . (b)(5), (b)(6), and (b)(7)(C).).) The ACLU filed an administrative appeal with ICE claiming that the redactions were not justified under FOIA and stating that the document production did not adequately address Plaintiffs' requests. *Id.* ¶ 8. ICE denied the appeal, stating that "the comprehensive search of the twenty-two field offices, with a referral to the Department of Justice, Executive Office of Immigration Review . . . and the search by the Office of the Inspector General . . . constituted a search reasonably calculated to uncover all relevant documents" and that the redaction of information "was proper in all respects and the information is exempt from disclosure under the applicable provisions of 5 U.S.C. § 552. . . ." *See id.,* Ex. J, Letter from Deputy Chief ICE Commercial and Administrative Law Division Susan Mathis to Rabinovitz, dated Aug. 31, 2010, at 3.

On September 21, 2010, Plaintiffs sent Defendants an additional FOIA request ("Second FOIA Request") seeking records relating to nearly 6,000 detainees released from ICE custody after lengthy periods of detention. *Id.* In response, on March 4, 2011, ICE produced 57 pages and six Excel spreadsheets, large portions of which were redacted. *Id.* ¶ 10. On April 26, 2011, ICE produced what it termed was its "second and final" set of documents, many of which were duplicative of documents contained in the March 4, 2011 production. *Id.* ¶ 11. ICE stated that "portions of 48 pages will be withheld pursuant to exemp-

tions . . . 5, 6, and 7(C) of the FOIA. . . ." (Complaint, Ex. W, Letter from Pavlik–Keenan Rabinovitz, dated March 4, 2011, at 4.)

On November 13, 2012, Defendants produced three spreadsheets containing 1,101,967 detainee-related data points, reflecting when detainees were "booked" into custody, whether detainees had a final order of removal against them, and how long each detainee had been held. (Def. Mem. at 4; Decl. of Michael Tan, dated Feb. 27, 2013 ("Tan Decl."), ¶¶ 3, 4, 6–9.) These documents show that between January 2011 and January 2012 the number of detainees held for longer than six months at the end of any given month ranged from approximately 444 to approximately 600. (Tan Decl. ¶ 8.) Some detainees had been held longer than six months, including a detainee who was held for four years plus (nearly) nine months at the Etowah County Jail in Gadsden, Alabama. *Id.* ¶ 9.

**For the reasons stated below, Plaintiffs' motion for summary judgment seeking disclosure of detainee information is granted and Defendant's motion for summary judgment seeking to withhold (exempt) certain detainee information is denied.**

### III. Legal Standard

 Congress enacted the Freedom of Information Act to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Associated Press v. Dep't of Defense,* 554 F.3d 274, 283 (2d Cir.2009). "FOIA exemptions are to be construed narrowly, resolving all doubts in favor of disclosure, and the government bears the burden of establishing that any claimed exemption applies." *Id.* at 284 (citation omitted).

 An alien's post–90–day detention is limited to a period reasonably necessary

to bring about that alien's removal from the United States. *Zadvydas*, 533 U.S. at 701, 121 S.Ct. 2491. There exists a "6–month presumption" against detention lasting more than 180 days. *Id.*

■ Summary judgment is the preferred procedural vehicle for resolving FOIA disputes. *Bloomberg L.P. v. Bd. of Governors of Fed. Reserve Sys.*, 649 F.Supp.2d 262, 271 (S.D.N.Y.2009). "FOIA expressly places the burden on the agency to sustain its [withholding of documents] and directs the district courts to determine the matter *de novo.*" *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 754, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989) (citation omitted). FOIA disputes generally "involve purely legal inquiries, and resolution of those inquiries is not contingent on resolution of any factual disputes." *Nat'l Immigration Project of the Nat'l Lawyers Guild v. Dep't of Homeland Security*, 868 F.Supp.2d 284, 290 (S.D.N.Y. 2012).

## IV. Analysis

### Litigation Privileges Exemption (5)

■ Upon request, FOIA mandates disclosure of records held by a federal agency unless the documents fall within one of nine enumerated exemptions. 5 U.S.C. § 552(b)(5); *Dep't of Interior v. Klamath Water Users Protective Assoc.*, 532 U.S. 1, 7, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001). FOIA's litigation privileges exemption, Exemption 5, permits a government agency to withhold from disclosure " 'inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency.' " *National Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir.2005) (quoting 5 U.S.C. § 552(b)(5)). The deliberative process privilege—which is one of the litigation privileges—covers "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Klamath Water Users Protective Assoc.*, 532 U.S. at 8, 121 S.Ct. 1060.

Plaintiffs contend that the litigation privileges FOIA exemption (5) does not apply because the documents sought in this case "do not go to policy formulation at all; they go to whether the Defendants are following their own regulations in their day-to-day interactions with detainees." (Pl. Mem. at 7.) The Government acknowledges, as noted, that it "largely agrees with Plaintiffs' expression of the parameters of the litigation privileges exemption, and therefore there may not be any controversy for the Court to resolve concerning the Government's invocation of [litigation privileges exemption]." Def. Mem. at 21. The Government also "acknowledges" that the Sample POCR File does *not* contain litigation privileges exemption-related material. *Id.* at 20 (emphasis added). The Government apparently only "redacted the … Sample at thirteen 'data points' simply to illustrate places where it anticipated encountering a privilege issue in its future … production" and "intends to assert [litigation privileges] only in appropriate, limited circumstances." *Id.*

While the Government has indicated that it may assert Exemption 5 in the future, it has not, as noted, presently done so. *Id.* at 21. Therefore, the issue is not ripe for adjudication. *See In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 110 (2d Cir.2013) ("The doctrine of constitutional ripeness 'prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur.' ") (quoting *Ross v. Bank of Am.*,

*N.A. (USA),* 524 F.3d 217, 226 (2d Cir. 2008)).[7]

Assuming, *arguendo,* that the issue of the Government's redactions on the basis of the litigation privileges exemption were ripe for adjudication, the Court would likely find that the exemption does not apply here. *See New York Times Co. v. Dep't of Def.,* 499 F.Supp.2d 501, 514 (S.D.N.Y. 2007) (The deliberative process privilege "does not shield all decision-making by public officials, such as routine operating decisions.") (citation omitted). Plaintiff appears to present a persuasive case that the redacted information does not qualify for the deliberative process privilege exemption because it is "part of the agenc[y's] routine operating decisions and ... *not* communications relating to policy formulation." (Pl. Mem. at 9; *see also Schiller v. City of New York,* No. 04 Civ 7922(KMK)(JCF), 2007 WL 136149, at *10 (S.D.N.Y. Jan. 19, 2007).)

### Privacy Exemptions (6 and 7(C))

■■■ Exemptions 6 and 7(C) are aimed at protecting privacy interests in personal information contained in government records. *Associated Press v. U.S. Dep't of Justice,* 549 F.3d 62, 65 (2d Cir.2008). Exemption 6 protects information about individuals in "personnel and medical files and similar files" where the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) is limited to "records or information compiled for law enforcement purposes," and protects personal information which "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

■■ The ACLU, as noted, has not sought any personal identifying information regarding detainees such as names or alien registration numbers. (*See* Stipulation ¶ 12.) Nevertheless, ICE has cited the privacy exemptions for redactions in the POCR Sample of information regarding:

- Details of the detainee's criminal history;
- The location of the detainee's (detention) facility;
- Arrival details concerning the detainee's entry into the United States;
- The detainee's travel status and history;
- The detainee's medical or psychological issues;[8] and
- Special circumstances including national security concerns.

(Def. Mem. at 11–12.)

Plaintiffs assert persuasively that the privacy exemptions are inapplicable because "[a]ll information that could identify an individual and therefore potentially implicate a privacy interest has been properly redacted by Defendants and has not been requested [by Plaintiffs] under the terms of the [September 6, 2012] Stipulation ... nor disputed by the ACLU." (Pl. Mem. at 11, 13.) Plaintiffs contend that the agreed-to redaction of personal identifying information means that no "non-trivial privacy interest is at stake" and that Defendants must disclose the records. (Pl. Mem. at 13.) Defendants respond that the information that ICE redacted is information "which, if revealed [presumably collectively], would be reasonably expected to implicate the alien's privacy interests."

---

**7.** Nor has the Government provided a *Vaughn* index specifically detailing litigation privileges information "that enables the court to review the agency's claimed redactions without having to pull the contextual information out of the redacted document itself." *Halpern,* 181 F.3d at 294.

**8.** See note 8, *infra.*

(Def. Mem. at 13; *see also* 1/23/13 Tr. at 7:11–14 (AUSA PELLEGRINO: "[I]t's sort of a mosaic theory that the agency has espoused. And it's basically when there is too much information regarding one person in the data here that they believe that it needs to be protected.").)

The parties agree that the disputed records fall within the categories of "personnel, medical and similar files" under Exemption 6 and "records or information compiled for law enforcement purposes" under Exemption 7(C). (Def. Mem. at 9; Pl. Mem. at 11 n. 9; *see also Associated Press*, 554 F.3d at 291 ("The phrase 'similar files' has a broad meaning and encompasses the government's records on an individual which can be identified as applying to that individual.") (citation omitted).) The parties also agree that, because Exemption 7(C) is more protective of privacy than Exemption 6 (and thus presents a "lower bar" for withholding materials), the Court "need only consider whether [the Government] properly invoked Exemption 7(C)." *ACLU v. Dep't of Justice*, 655 F.3d 1, 6 (D.C.Cir.2011); *see also* Pl. Mem. at 11 n. 8; Def. Mem. at 11 (citing *Perlman v. Dep't of Justice*, 312 F.3d 100, 106 (2d Cir.2002)).

▇ In determining whether the production of the detainee documents would result in an unwarranted invasion of personal privacy, the Court must first determine "whether there is any privacy interest at stake." *ACLU*, 655 F.3d at 6. If there is a privacy interest at stake, the Court must then "balance the public interest in disclosure against the [privacy interest]." *Id.*

The information sought by Plaintiff must be disclosed.[9] *See New York Times Co. v. Dep't of Homeland Sec.*, 959 F.Supp.2d 315, 456, 12 Civ 8100(SAS), 2013 WL 2952012, at *5 (S.D.N.Y. June 13, 2013). For one thing, the Government appears to acknowledge that the information categories (alone) sought by Plaintiff do not implicate a privacy interest because the identity of the detainee is not sought or revealed. (1/23/13 Tr. at 7:3–4 (AUSA PELLEGRINO: "In and of itself, just the location of [detention, for example,] may not be a problem.")). For another, Defendants "mosaic theory," i.e. that the information sought by ACLU "is so collectively unique that even without a name or alien number, it is still a personally identifying characteristic," is, in this case at least, unpersuasive. (*See* Def. Mem. at 14–15.) The Government hypothesizes that "[i]f [an] individual is the only Liberian to have crossed into the United States through a small Arizona border town, or if he were the only Liberian with a rare or unusual medical condition, or the only Liberian with a particular criminal history, it would be relatively easy for someone to specifically identify that person, or for the alien himself to recognize the public disclosure of his own file and sue ICE for privacy violations, even though his name was not specifically disclosed." *Id.* at 13–14.

The Court agrees with Plaintiff that identification of an individual detainee from this data "would require an additional and unlikely chain of events: (1) that the Plaintiffs would take the disclosed information and broadcast it to the small Arizona town, (2) someone in said town would receive the information and be familiar with the Liberian residents in that town and (3) that harm would arise somehow from such recognition." (Pl. Rep. at 3.) The Court finds that "there [is] no substantial likelihood that any concrete facts about a particular individual could be inferred." *Nat'l Assoc. of Retired Fed.*

9. *See* note 10, *infra.*

*Emps. v. Horner,* 879 F.2d 873, 878 (D.C.Cir.1989) (citing *Arieff v. Dep't of Navy,* 712 F.2d 1462, 1468 (D.C.Cir.1983)). Indeed, the Government offers no support or explanation for its (illustrative) assertion that, utilizing a detainee's criminal history "it would be relatively easy for someone to specifically identify" that detainee. (*See* Def. Mem. at 13–14.) Defendants have, therefore, failed to demonstrate that the information sought "could reasonably be expected to constitute an unwarranted invasion of privacy." 5 U.S.C. § 552(b)(7)(C); *see also* Pl. Mem. at 3 (citing *ACLU,* 655 F.3d at 10). Because the records will be produced anonymously, no privacy interest will be implicated.[10] *See Dep't of State v. Ray,* 502 U.S. 164, 175–76, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991) (privacy exemptions implicated only by "identifying information"); *New York Times,* 959 F.Supp.2d at 450, 2013 WL 2952012, at *1 (Where (even) the names of "all aliens since 2008 who, after being convicted of a crime and serving their sentence, were designated for removal but were released from DHS custody pursuant to *Zadvydas*" were not exempt from production).

■ The Government has not adequately explained why individual categories of disputed information—such as the location of the detention facility, arrival dates, or port of entry, etc.—implicate privacy concerns. *See Associated Press.,* 554 F.3d at 283 ("[T]he government bears the burden of establishing that any claimed exemption applies.") (citation omitted);

Def. Mem. at 14–16. For example, Defendants have broadly asserted that arrival dates and port of entry information "could lead to identity theft" and "could lead to embarrassment, harassment, or undue public attention," but they have offered no legally cognizable explanation for nondisclosure. *Id.* at 16. "The invocation of [the privacy exemptions] requires 'threats to privacy interests more palpable than mere possibilities.'" *Lawyers Comm. For Human Rights v. INS,* 721 F.Supp. 552, 563 (S.D.N.Y.1989) (quoting *Dep't of Air Force v. Rose,* 425 U.S. 352, 380, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976)).

And even assuming, *arguendo,* that the redacted information did implicate a privacy interest, the privacy exemption would still likely be inapplicable because the public interest in disclosure would appear to outweigh any privacy concerns. *See ACLU,* 655 F.3d at 6; *Associated Press.,* 554 F.3d at 284 (The privacy exemptions "require[ ] a court to balance the public interest in disclosure against the privacy interest Congress intended the Exemption[s] to protect.") (citations omitted). The public interest in disclosure is particularly compelling here because the ACLU seeks to highlight ICE's historically troublesome practices of "prolonged immigration detention—for months, if not years— without adequate procedures in place to determine whether their detention is justified." (Complaint ¶ 2; *see also New York Times Co.,* 959 F.Supp.2d at 454, 2013 WL 2952012, at *3 ("The public has an interest

---

10. The Court also suggests to the parties that, because medical records are involved and because such records often contain sensitive information, the parties may wish jointly to develop protective procedures with respect to medical information to ensure that such records are safeguarded and, w hen appropriate, destroyed. *See GTE Sylvania, Inc. v. Consumers Union,* 445 U.S. 375, 386–87, 100 S.Ct. 1194, 63 L.Ed.2d 467 (1980) (nondisclo-

sure order may affect FOIA production); *Raher v. Fed. Bureau of Prisons,* No. 09 Civ. 526, 2011 WL 2014875, at *11 (D.Oregon May 24, 2011) ("In order to prevent the public release of potentially damaging information to BOP's security concerns [pursuant to FOIA request], BOP may release such information pursuant to a protective order that prohibits disclosure by Raher to anyone else without prior BOP or court approval.").

in knowing how ICE handles aliens ... who are required to be released pursuant to *Zadvydas* when their detention period exceeds six months. This is '[o]fficial information that sheds light on an agency's performance of its statutory duties.'") (quoting *Reporters Comm.*, 489 U.S. at 773, 109 S.Ct. 1468); *Associated Press*, 554 F.3d at 285 ("[T]here is only one relevant [public] interest, namely, 'to open agency action to the light of public scrutiny.'") (quoting *Reporters Comm.*, 489 U.S. at 773, 109 S.Ct. 1468); *see also* p. 311, *supra.*)

The faulty detention review procedures which have been followed by ICE, and ICE's failure to comply with the Supreme Court's ruling in *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, as noted, have been investigated and highlighted by Government oversight agencies. In 2007, the Department of Homeland Security Office of Inspector General observed noted that United States Immigration and Customs Enforcement "is responsible for ensuring compliance with [*Zadvydas*]." but also that "ICE has not provided sufficient guidance on applying [*Zadvydas's*] 'reasonably foreseeable future' standard and does not systematically track removal rates—information that is necessary for ... determining whether detention space is used effectively." (Complaint, Ex. C, DHS Office of Inspector General, "ICE's Compliance with Detention Limits for Aliens with a Final Order of Removal from the United States," OIG–07–28 ("OIG 2007 Report"), at 1 (Feb.2007); *see also* p. 311, *supra.*) (Complaint, Ex. C, DHS Office of Inspector General, "ICE's Compliance with Detention Limits for Aliens with a Final Order of Removal from the United States," OIG–07–28 ("OIG 2007 Report"), at 33–34 (Feb.2007) ("Although the burden on the federal government increases the longer an alien is held in detention, ICE regulations and procedures provide less oversight after an alien has been held 180 days. Citing the Supreme Court's decision in *Zadvydas,* ICE guidance acknowledges, 'the longer an alien remains in ICE custody with a final order, the higher the government's burden to establish that the alien's removal will occur in the reasonably foreseeable future.' Yet some aliens are held for reasons that appear to weaken with time.").)

Plaintiffs point out that "criminal and immigration history is crucial for the public to assess whether ICE is making adequate and individualized determinations of flight risk and danger, which the agency has often failed to make," (Pl. Rep. at 5 (citing *Ngo v. INS*, 192 F.3d 390, 398 (3d Cir.1999); *D'Alessandro v. Mukasey*, 628 F.Supp.2d 368, 398–99 (W.D.N.Y.2009))). Likewise, according to Plaintiffs "the public has a strong interest in learning how medical conditions factor into ICE's custody determinations" and a detainee's public safety risk. (Pl. Rep. at 15 (citing *D'Alessandro*, 628 F.Supp.2d at 399).) Defendants response that the "value of learning how personal criminal histories, medical histories, or other factors affect ICE's implementation of *Zadvydas*" is "minimal" is conclusory and unsupported. (Pl. Mem. at 17.)

Production of the disputed information to Plaintiffs is clearly in the public interest and will enable the ACLU to shed further light on ICE's detainee practices and procedures (and strengths and inadequacies) and would appear to far outweigh any potentially implicated privacy interest. *See Reporters Comm.*, 489 U.S. at 773, 109 S.Ct. 1468 ("Official information that sheds light on an agency's performance of its statutory duties falls squarely within

**318**

[FOIA's] statutory purpose").[11] "[W]ithout this information, the public has to simply take the government's word for it that someone's prolonged detention is necessary." (Pl. Rep. at 6.)

### Law Enforcement Information Exemption (7(E))

 FOIA's law enforcement information exemption covers:

"[R]ecords or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."

5 U.S.C. § 552(b)(7)(E). Defendants invoked the law enforcement information exemption to redact from the POCR Sample File detainee information regarding detainee's medical history, "special circumstances" (to continue detention), general comments taken from ICE officials' custody determinations, and national security concerns. (See Amen. Law Decl. ¶¶ 26–28.) Defendants contend that the redacted information "as a whole—including the medical criteria and national security com-

ments—implicate the procedures used in evaluating whether or not to continue detention" and if this information were revealed, it would demonstrate how law enforcement officers weigh the factors in conducting detention reviews. (Def. Mem. at 22, 23.) Plaintiffs persuasively counter that the law enforcement information exemption is inapplicable because the Government's disclosure "would not reveal law enforcement 'techniques and procedures' or 'guidelines' under 5 U.S.C. § 552(b)(7)(E)." (Pl. Rep. at 7.)

 The law enforcement information exemption is not available here.[12] For one thing, the Government acknowledges that its procedure for determining whether to continue detention (contained in the "Continued Detention of Removable Aliens on Account of Special Circumstances" form) is available in 8 C.F.R. § 241.14. (Def. Mem. at 23 (Factors in detention review "are considered within the context of ICE's evaluation of 8 C.F.R. § 241.14 ('Continued Detention of Removable Aliens on Account of Special Circumstances'), which is a published regulation.").) Defendants unpersuasively assert that *"how* ICE applies those factors to a [detention] determination is not public knowledge" and constitutes techniques and procedures protected by the law enforcement information privi-

---

**11.** Several immigration reform measures have been proposed in Congress to deal with flaws in ICE detention practices. *See, e.g.,* Border Security, Economic Opportunity, and Immigration Modernization Act, Amendment 1264 to S. 744, 113th Cong. (2013) (imposing on certain immigration detention facilities "the duty to release information about the *operation of the . . . facility");* Immigration Oversight and Fairness Act, H.R. 1215, 111th Cong. (2009); Death in Custody Reporting Act, H.R. 738, 111th Cong. (2009) (requiring the submission of "information regarding the death of any person . . . detained at any facility (including any immigration . . . facility");* Secure and Safe Detention and Asylum Act, S. 3114, 110th Cong. (2008) ("A decision to con-

tinue detention without bond or parole shall specify in writing the reasons for that decision.");* see also, Diop v. Department of Homeland Security,* 656 F.3d 221 (3d Cir.2011) ("It was unconstitutional [for ICE] to detain Diop for nearly three years under the authority granted by Congress.");* Nadarajah v. Gonzales,* 443 F.3d 1069 (9th Cir.2006) ("The nearly five-year detention in this case far exceeds both any period of confinement found reasonable by the Court, and the six-month period of presumptive reasonableness.").

**12.** See *supra* note 10 regarding protective procedures for medical records.

lege. (Def. Mem. at 23 (emphasis in original).) Second, "[t]he phrase 'techniques and procedures' ... refers to how law enforcement officials go about investigating a crime." *Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Security,* 626 F.3d 678, 682 (2d Cir. 2010). The Court believes that the release of factual information concerning a (non-identified) detainee's criminal record, which is often publicly available, would not compromise ICE's ability to conduct (further) investigations and does not implicate "techniques and procedures." *See id.*

Finally, the Government argues on summary judgment—without explaining why it did not assert this argument earlier in its administrative review of the Plaintiffs' FOIA request (*see* pp. 311–12, *supra*) or in its *Vaughn* Index—that it "properly withheld [the disputed information] under the second clause of [the law enforcement information exemption], which protects 'guidelines for law enforcement investigations or prosecutions....'" (Def. Mem. at 23–24 (quoting 5 U.S.C. § 552(b)(7)(E)).) As Plaintiffs point out, "[i]n the *Vaughn* Index submitted in February 2013, the Government used the phrase 'techniques and procedures' exclusively to describe the disputed [detention review] data and did not describe any of the information as 'guide[lines].'" (Pl. Rep. at 8.) The Government has not met its burden to provide "information that enables the court to review the agency's claimed redactions without having to pull the contextual information out of the redacted document itself." *Halpern,* 181 F.3d at 294. That is, the Government has not provided sufficient evidence that the redacted data constitute "guidelines." *Lowenstein,* 626 F.3d at 682 ("[I]n the context of [the law enforcement information exemption, guidelines] generally refers to resource allocation.").

Even assuming, *arguendo,* that the Government had demonstrated that the redacted information constituted "guidelines," the disputed information must still likely be disclosed because the law enforcement information exemption only permits withholding "guidelines" if disclosure "could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The Government asserts (unpersuasively) that "if [the redacted] information were revealed, it would demonstrate how law enforcement officers weigh the factors in conducting [detention] reviews, which would in turn permit people seeking to violate the immigration and customs laws and regulations to circumvent the law by taking proactive steps to fraudulently avoid continued detention." (Def. Mem. at 24.) In so doing, "the Government fails to explain at all how a detainee, given access to his or her own [review] data, after the fact and living in a detention center, could tailor any relevant type of conduct or alter any relevant type of information to accomplish this." (Pl. Rep. at 9.)

## V. Conclusion & Order

For the foregoing reasons, Plaintiffs' motion for summary judgment [# 23] is granted and Defendants' cross-motion for summary judgment [# 32] is denied. The Clerk of the Court is respectfully requested to enter judgment in favor of the Plaintiffs. Defendants are to produce the records requested in the September 6, 2012 Stipulation no later than November 3, 2013.

The Clerk of Court is further requested to close this case.