RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0164p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

DETROIT FREE PRESS INC.,

        *Plaintiff-Appellee,*

    *v.*

UNITED STATES DEPARTMENT OF JUSTICE,

        *Defendant-Appellant.*

No. 14-1670

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:13-cv-12939—Patrick J. Duggan, District Judge.

Argued: March 9, 2016

Decided and Filed: July 14, 2016

Before: COLE, Chief Judge; GUY, BOGGS, BATCHELDER, MOORE, CLAY,
GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE, GRIFFIN, KETHLEDGE,
WHITE, STRANCH, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Steve Frank, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.,
for Appellant. Robert M. Loeb, ORRICK, HERRINGTON & SUTCLIFFE LLP, Washington,
D.C., for Appellee. **ON BRIEF:** Steve Frank, UNITED STATES DEPARTMENT OF
JUSTICE, Washington, D.C., for Appellant. Robert M. Loeb, Thomas M. Bondy, ORRICK,
HERRINGTON & SUTCLIFFE LLP, Washington, D.C., Paul R. McAdoo, AARON
& SANDERS PLLC, Nashville, Tennessee, Brian P. Goldman, Cynthia B. Stein, ORRICK,
HERRINGTON & SUTCLIFFE LLP, San Francisco, California, for Appellee. Daniel J. Klau,
MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP, Hartford, Connecticut, David
Marburger, MARBURGER LAW LLC, Cleveland, Ohio, for Amici Curiae.

      COOK, J., delivered the opinion of the court in which COLE, C.J., and GUY, GIBBONS,
ROGERS, SUTTON, McKEAGUE, KETHLEDGE, and WHITE, JJ., joined. COLE, C.J. (pp.
10–11), delivered a separate concurring opinion. BOGGS, J. (pp. 12–23), delivered a separate

1

dissenting opinion in which BATCHELDER, MOORE, CLAY, GRIFFIN, STRANCH, and DONALD, JJ., joined.

————————————

**OPINION**

————————————

COOK, Circuit Judge. In 1996, we held that the Freedom of Information Act (FOIA), 5 U.S.C. § 552, required the release of booking photos of criminal defendants who have appeared in court during ongoing proceedings, finding that criminal defendants lack any privacy interest in the photos. *Detroit Free Press, Inc. v. Dep't of Justice* (*Free Press I*), 73 F.3d 93 (6th Cir. 1996). Twenty years and two contrary circuit-level decisions later, we find *Free Press I* untenable. Individuals enjoy a non-trivial privacy interest in their booking photos. We therefore overrule *Free Press I*.

**I.**

FOIA implements "a general philosophy of full agency disclosure" of government records, *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 754 (1989) (quoting *Dep't of the Air Force v. Rose*, 425 U.S. 352, 360 (1976)), requiring federal agencies to make their records "promptly available" to any person who requests them, 5 U.S.C. § 552(a)(2)–(3). An agency may withhold or redact information that falls within one of nine statutory exemptions. *Id.* § 552(b). Exemption 7(C), at issue here, permits agencies to refuse requests for "records or information compiled for law enforcement purposes" if public release "could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C).

*Free Press I* held that "no privacy rights are implicated" by releasing booking photos "in an ongoing criminal proceeding, in which the names of the defendants have already been divulged and in which the defendants themselves have already appeared in open court." *Free Press I*, 73 F.3d at 97. Under those conditions, booking photos reveal "[n]o *new* information that . . . indictees would not wish to divulge" to the public. *Id.* The court bypassed deciding whether

releasing the images following acquittals, dismissals, or convictions would implicate privacy interests. *Id.*

Bound by *Free Press I*, the United States Marshals Service (USMS) adopted a "bifurcated policy" for releasing booking photos. Within the Sixth Circuit's jurisdiction, the USMS would honor all requests for photos under the circumstances outlined in *Free Press I*. Outside the Sixth Circuit, however, the USMS continued to follow its long-standing policy of refusing requests for booking photos. "Straw man" requesters in Michigan, Ohio, Kentucky, and Tennessee accordingly exploited the policy to obtain photos maintained in other jurisdictions, securing Bernie Madoff's booking photo in one prominent example.

The USMS's patchwork disclosure system persisted until the Tenth and Eleventh Circuits considered booking-photo disclosure and disagreed with *Free Press I*'s analysis. *See World Publ'g Co. v. U.S. Dep't of Justice*, 672 F.3d 825 (10th Cir. 2012); *Karantsalis v. U.S. Dep't of Justice*, 635 F.3d 497 (11th Cir. 2011) (per curiam) (adopting district court opinion), *cert. denied*, 132 S. Ct. 1141 (2012). Bolstered by these decisions, the USMS abandoned the bifurcated policy in 2012 and refused—nationwide—to honor FOIA requests for booking photos.

Accordingly, when Detroit Free Press (DFP) requested the booking photos of four Michigan police officers charged with bribery and drug conspiracy, the Deputy U.S. Marshal for the Eastern District of Michigan denied the request. In the lawsuit that followed, both the district court and the panel, constrained by *Free Press I*, ordered disclosure. We granted rehearing en banc to reconsider whether there is a personal-privacy interest in booking photos.

**II**.

**A. Exemption 7(C)'s Personal-Privacy Interest**

Exemption 7(C) prevents disclosure when: (1) the information was compiled for law enforcement purposes and (2) the disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Neither party disputes that booking photos meet the first requirement. The second requires that we "balance the public interest in disclosure against the [privacy] interest Congress intended [Exemption 7(C)] to

protect." *Reporters Comm.*, 489 U.S. at 776.  The government shoulders the burden of showing that Exemption 7(C) shields the requested information from disclosure.  5 U.S.C. § 552(a)(4)(B).

The Supreme Court has described Exemption 7(C) as reflecting privacy interests in "avoiding disclosure of personal matters," *Reporters Comm.*, 489 U.S. at 762, maintaining "the individual's control of information concerning his or her person," *id*. at 763, avoiding "disclosure of records containing personal details about private citizens," *id*. at 766, and "keeping personal facts away from the public eye," *id*. at 769.  Embarrassing and humiliating facts—particularly those connecting an individual to criminality—qualify for these descriptors.  *See, e.g., id.* at 771 (finding a privacy interest in criminal rap sheets); *Union Leader Corp. v. U.S. Dep't of Homeland Sec.*, 749 F.3d 45, 53 (1st Cir. 2014) (the names of arrestees); *Rimmer v. Holder*, 700 F.3d 246, 257 (6th Cir. 2012) (the names and identifying information of individuals associated with investigation of a murder); *ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 8 (D.C. Cir. 2011) (the fact of an individual's conviction and corresponding docket number); *McCutchen v. U.S. Dep't of Health & Human Servs.*, 30 F.3d 183, 187–88 (D.C. Cir. 1994) (a researcher's investigation and exoneration for academic-integrity concerns); *Kiraly v. FBI*, 728 F.2d 273, 277 (6th Cir. 1984) (FBI files identifying individuals suspected of criminal activity but not indicted or tried).

Booking photos—snapped "in the vulnerable and embarrassing moments immediately after [an individual is] accused, taken into custody, and deprived of most liberties"—fit squarely within this realm of embarrassing and humiliating information.  *Karantsalis*, 635 F.3d at 503.  More than just "vivid symbol[s] of criminal *accusation*," booking photos convey *guilt* to the viewer.  *Id.* (emphasis added).  Indeed, viewers so uniformly associate booking photos with guilt and criminality that we strongly disfavor showing such photos to criminal juries.  *See United States v. Irorere*, 69 F. App'x 231, 235 (6th Cir. 2003) ("[T]he Sixth Circuit has condemned the practice of showing 'mug shot' evidence to a jury 'as effectively eliminating the presumption of innocence and replacing it with an unmistakable badge of criminality.'" (quoting *Eberhardt v. Bordenkircher*, 605 F.2d 275, 280 (6th Cir. 1979))); *see also United States v. McCoy*, 848 F.2d 743, 745–46 (6th Cir. 1988) (finding the district court erred in overruling an objection to lineup

photos, which "suggest that [the defendant] is a 'bad guy' who belongs in jail"). This alone establishes a non-trivial privacy interest in booking photos.

Other considerations gleaned from Supreme Court decisions strengthen our conclusion. For example, the Court noted that the Exemption 7(C) privacy interest "must be understood . . . in light of the consequences that would follow" from unlimited disclosure. *See Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 170 (2004); *see also ACLU*, 655 F.3d at 7 ("[C]ourts have taken into consideration potential derivative uses of that information."). In *Favish*, the Court recognized family members' privacy interest in death-scene images of their loved one, noting that the deceased's abusers or murderers could request records under FOIA. 541 U.S. at 170. Leaving the government leeway "to deny these gruesome requests in appropriate cases" factored into the Court's decision to recognize a statutory privacy interest. *Id.* And modern technology only heightens the consequences of disclosure—"in today's society the computer can accumulate and store information that would otherwise have surely been forgotten." *Reporters Comm.*, 489 U.S. at 771; *see also Favish*, 541 U.S. at 167.

A disclosed booking photo casts a long, damaging shadow over the depicted individual. In 1996, when we decided *Free Press I*, booking photos appeared on television or in the newspaper and then, for all practical purposes, disappeared. Today, an idle internet search reveals the same booking photo that once would have required a trip to the local library's microfiche collection.[1] In fact, mug-shot websites collect and display booking photos from decades-old arrests: BustedMugshots and JustMugshots, to name a couple. *See* David Segal, *Mugged by a Mug Shot Online*, N.Y. Times, (Oct. 5, 2013), http://www.nytimes.com/2013/10/06/business/mugged-by-a-mug-shot-online.html. Potential employers and other acquaintances may easily access booking photos on these websites, hampering the depicted individual's professional and personal prospects. *See ACLU*, 655 F.3d at 7 (noting that Exemption 7(C)'s privacy interest includes facts that "may endanger one's

---

[1]Beginning in 1997, the U.S. Census Bureau asked Americans about internet access and found that less than one-fifth of American households had internet access at home. By 2013, that number jumped to 74.4%. Thom File & Camille Ryan, Computer and Internet Use in the United States: 2013, U.S. Census Bureau, 2 (2014), http://www.census.gov/content/dam/Census/library/publications/2014/acs/acs-28.pdf; Thom File, Computer and Internet Use in the United States, U.S. Census Bureau, 1 (2013), http://www.census.gov/prod/2013pubs/p20-569.pdf.

prospects for successful reintegration into the community" (internal quotation marks omitted)). Desperate to scrub evidence of past arrests from their online footprint, individuals pay such sites to remove their pictures. Indeed, an online-reputation-management industry now exists, promising to banish unsavory information—a booking photo, a viral tweet—to the third or fourth page of internet search results, where few persist in clicking. *See* Jon Ronson, *So You've Been Publicly Shamed* 263–74 (2015). The steps many take to squelch publicity of booking photos reinforce a statutory privacy interest.

**B. DFP's Arguments**

Against the privacy interest elucidated above, DFP interposes the Constitution, the common law and traditional understandings of privacy, the absence of a "web of federal statutory and regulatory provisions" limiting disclosure, and the fact that most states allow mug-shot disclosure. DFP posits that FOIA facilitates a free flow of information lacking a background of privacy protection in state and federal law. *See Favish*, 541 U.S. at 169 (noting that "Congress legislated against [a] background of law, scholarship, and history when it enacted FOIA").

### 1. The Constitution

DFP overemphasizes the Constitution's role in defining statutory privacy rights. Indeed, in *Reporters Committee*, the Court shrugged off the lack of a *constitutional* right to privacy in information connecting an individual to criminal activity before recognizing a *statutory* right to privacy in the same type of information. 489 U.S. at 762 n.13 (citing *Paul v. Davis*, 424 U.S. 693, 712–14 (1976)).

### 2. The Common Law and Legal Traditions

Next, DFP invokes the common law and legal traditions as sanctioning publication of criminal activity. Closely intertwined with public trials, booking photos form part of the public record, and the common law recognizes no invasion-of-privacy tort remedy for publicizing facts in the public record. *See* Restatement (Second) of Torts § 652D cmt. b (1977); *see also id.* cmt. f, illus. 13.

The common law and American legal traditions leave undisturbed an existing statutory privacy interest.  Even when information concerning an individual's person becomes part of the public record, "one d[oes] not necessarily forfeit a privacy interest," though the interest "diminishe[s]."  *Reporters Comm.*, 489 U.S. at 763 n.15.  Further, the common law differentiates between "facts about the plaintiff's life that are matters of public record," and matters of public record "not open to public inspection."  Restatement (Second) of Torts § 652D cmt. b.  Booking photos, like rap sheets, fit into the latter category, to which the Supreme Court extended privacy protection under Exemption 7(C).  *See Reporters Comm.*, 489 U.S. at 763–64 ("[I]nformation may be classified as 'private' if it is 'intended for or restricted to the use of a particular person or group or class of persons . . . .'" (quoting Webster's Third New International Dictionary 1804 (1976))).  And we already noted the criticism of using mug shots in open trials.  *See Eberhardt*, 605 F.2d at 280.

The dissent's focus on the historic use of "rogues' galleries" only confirms the risks at hand—that the public has long wanted to look at these photos.  But that says nothing about the individual's privacy interest.  Surely there can exist both a strong public interest in a mug-shot's disclosure *and* a strong privacy interest.

### 3.  State and Federal Laws

Persisting, DFP highlights that some states statutorily mandate the release of booking photos and urges us to follow their lead.  *See, e.g.*, Minn. Stat. § 13.82(26)(b) ("[A] booking photograph is public data."); Neb. Rev. Stat. § 29-3521(1) (noting that "photographs taken in conjunction with an arrest" are public records); Va. Code Ann. § 2.2-3706(A)(1)(b) (ordering release of "[a]dult arrestee photographs taken during the initial intake" unless certain exceptions apply).  True, but other states require FOIA-like balancing of public and private interests before disclosing booking photos.  *See, e.g.*, 21 Kan. Op. Atty. Gen. 9, No. 87-25, 1987 WL 290422, at *4 (Feb. 9, 1987) (opining that Kan. Stat. Ann. § 45-221(a)(10)(A) allows nondisclosure of booking photos); *Prall v. N.Y.C. Dep't of Corr.*, 10 N.Y.S.3d 332, 335 (N.Y. App. Div. 2015) (balancing public and private interests under N.Y. Pub. Off. Law § 89(2)(b) to determine that booking photos need not be disclosed to mug-shot websites).  And several states exempt booking photos from public-record disclosure laws.  *See* Del. Code Ann. tit. 29 § 10002(*l*)(4); Ga. Code

Ann. § 50-18-72(a)(4); 65 Pa. Stat. Ann. § 67.708(b)(16); S.D. Codified Laws § 1-27-1.5(5); *see also* Kean Exec. Order No. 123 (Nov. 12, 1985) (exempting booking photos from the New Jersey public-records law), http://www.state.nj.us/infobank/circular/eok123.shtml.

Decidedly mixed, state laws favor neither wholesale disclosure nor nondisclosure. Regardless, "[s]tate policies . . . do not determine" Exemption 7(C)'s meaning, but can evidence broad acceptance of a significant privacy interest. *Reporters Comm.*, 489 U.S. at 767. More important to the FOIA analysis are the *federal* regulations and policies drafted by the U.S. Department of Justice and the USMS, *see Reporters Comm.*, 489 U.S. at 764–65 (noting that the "web of *federal* statutory and regulatory provisions" limiting rap-sheet disclosure supported a privacy interest (emphasis added)); *see also World Publ'g Co.*, 672 F.3d at 829, and these prevent mug-shot disclosure absent a law-enforcement purpose, *see* 1987 USMS Publicity Policy at 8.1-2(a); 28 C.F.R. § 50.2(b)(7). A mixed bag of state privacy laws cannot extinguish FOIA personal-privacy protections.

*Free Press I*'s finding that "no privacy rights are implicated" by booking photos embodies an impermissibly cramped notion of personal privacy that is out of step with the broad privacy interests recognized by our sister circuits. *See, e.g.*, *Union Leader Corp.*, 749 F.3d at 53 (the names of arrestees); *World Publ'g Co.*, 672 F.3d at 830 (booking photos); *ACLU*, 655 F.3d at 8 (convicted individual's docket numbers); *Karantsalis*, 635 F.3d at 503 (booking photos). Individuals enjoy a non-trivial privacy interest in their booking photos, and we overrule *Free Press I*'s contrary holding.

### III.

Having found a non-trivial privacy interest, the court must balance that interest against the public's interest in disclosure. The USMS favors balancing these interests on a case-by-case basis, while DFP advances a categorical approach with the public interest always outweighing the privacy interest. *See Reporters Comm.*, 489 U.S. at 776 ("[C]ategorical decisions *may be* appropriate and individual circumstances disregarded when a case fits into a genus in which the balance characteristically tips in one direction." (emphasis added)). We agree with the USMS and adopt a case-by-case approach, elucidating the public interest at issue.

The public's interest in disclosure depends on "the extent to which disclosure would serve the 'core purpose of the FOIA,' which is 'contribut[ing] significantly to public understanding *of the operations or activities of the government.*'" *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 495 (1994) (alteration in original) (quoting *Reporters Comm.*, 489 U.S. at 775). If disclosure is not "likely to advance [a significant public] interest . . . , the invasion of privacy is unwarranted." *Favish*, 541 U.S. at 172. "[S]hed[ding] light on an agency's performance of its statutory duties falls squarely within" FOIA's core purpose. *Reporters Comm.*, 489 U.S. at 773. On the other hand, that purpose "is not fostered by disclosure of information about private citizens . . . that reveals little or nothing about an agency's own conduct." *Id.*

Favoring a categorical rule over case-by-case balancing, the dissent highlights the public importance of disclosure by pointing to the possibility of mistaken identity, impermissible profiling, and arrestee abuse. But these are phantoms. In cases of mistaken identity, arrestees are not going to protest using their booking photos to show that they are not the villain. Such arrestees undoubtedly will want the booking photo released so that they too can be released. The same goes for profiling and arrestee abuse. The privacy interest in a booking photo is the defendant's, and he or she can waive that interest.

**IV**.

In 1996, this court could not have known or expected that a booking photo could haunt the depicted individual for decades. *See Free Press I*, 73 F.3d at 97 (finding that, unlike booking photos, rap sheets include information "that, under other circumstances, may have been lost or forgotten"). Experience has taught us otherwise. As the Tenth and Eleventh Circuits recognize, individuals have a privacy interest in preventing disclosure of their booking photos under Exemption 7(C). Of course, some public interests can outweigh the privacy interest, but *Free Press I* wrongly set the privacy interest at zero. We overrule *Free Press I*, reverse the grant of summary judgment, and remand to the district court for proceedings consistent with this opinion.

---

## CONCURRENCE

---

COLE, Chief Judge, concurring. I agree with the majority that criminal defendants have a non-trivial privacy interest in their booking photographs. And I agree that the time has come to overrule our decades-old decision in *Detroit Free Press, Inc. v. Dep't of Justice* (*Free Press I*), 73 F.3d 93 (6th Cir. 1996). I write separately only to emphasize two points touched upon by the majority.

*First*, Exemption 7(C) of the Freedom of Information Act, 5 U.S.C. § 552(b)(7)(C), plainly extends to a private individual's desire to avoid disclosure of personal details that may be humiliating, embarrassing, or painful. *See Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 166–67 (2004); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 770 (1989). Mugshots fit the bill.

Twenty years ago, we thought that the disclosure of booking photographs, in ongoing criminal proceedings, would do no harm. But time has taught us otherwise. The internet and social media have worked unpredictable changes in the way photographs are stored and shared. Photographs no longer have a shelf life, and they can be instantaneously disseminated for malevolent purposes. Mugshots now present an acute problem in the digital age: these images preserve the indignity of a deprivation of liberty, often at the (literal) expense of the most vulnerable among us. Look no further than the online mugshot-extortion business. In my view, *Free Press I*—though standing on solid ground at the time—has become "inconsistent with the sense of justice." *See* B. Cardozo, The Nature of the Judicial Process 150 (1921). These evolving circumstances permit the court to change course.

*Second*, I understand the majority's approach as simply "providing a workable formula which encompasses, balances, and protects all interests." *See* S. Rep. No. 89-813, at 38 (1965). Congress structured Exemption 7(C) to at once promote "a general philosophy of full agency disclosure" and "protect certain equally important rights of privacy." *Id.*; *see also U.S. Dep't of Def. v. FLRA*, 510 U.S. 487, 494 (1994).

Today's opinion, as I read it, does not foreclose the possibility that, in the appropriate case, a requester might make a meaningful showing of the "significant public interest" in "reveal[ing] the circumstances surrounding an arrest and initial incarceration." *See Free Press I*, 73 F.3d at 97–98 (noting, in dicta, the potential for "public oversight" of law enforcement conduct); *see also Favish*, 541 U.S. at 173–75 (discussing the showing required to substantiate an "asserted public interest in uncovering deficiencies or misfeasance" in government investigations). There will be time enough to deal with such a situation. The majority rightly gives the lower courts the chance to balance, in the first instance, the equally important values of public disclosure and personal privacy. Neither is abrogated.

With this explanation, I join the majority's persuasive opinion in full.

————————————

**DISSENT**

————————————

BOGGS, Circuit Judge, dissenting.  More than twenty years ago, this court determined that the Freedom of Information Act, a federal statute dedicated to open government, requires the release of federal indictees' booking photographs.  The Supreme Court did not correct our reading, and neither did Congress.  Nevertheless, today's majority reverses that determination, citing as justification only a vague privacy interest in inherently non-private matters.  Today's decision obscures our government's most coercive functions—the powers to detain and accuse— and returns them to the shadows.  Open government is too dear a cost to pay for the mirage of privacy that the majority has to offer.  I respectfully dissent.

I

Congress passed the Freedom of Information Act (FOIA), 5 U.S.C. § 552, with the purpose of "open[ing] agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (quoting *Rose v. Dep't of Air Force*, 495 F.2d 261, 263 (2d Cir. 1974)).  The Act's role in promoting democracy is no less critical than in years past, as democracy always "works best when the people have all the information that the security of the Nation permits."  Lyndon B. Johnson, Statement Upon Signing the "Freedom of Information Act" (July 4, 1966), *in* 2 The Public Papers of the Presidents of the United States, Lyndon B. Johnson: 1966, at 699 (1967); *see also Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171–72 (2004).  To further Congress's overriding goal of "full agency disclosure," *Rose*, 425 U.S. at 360 (quoting S. Rep. No. 89-813, at 3 (1965)), FOIA "mandates" that agencies disclose records on request unless the government can prove that one of nine "narrowly construed" exemptions applies, *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (quoting *FBI v. Abramson*, 452 U.S. 615, 630 (1982)).

One of those "narrow" exemptions, Exemption 7(C), allows federal agencies to refuse requests for "records or information compiled for law enforcement purposes" when their public release "could reasonably be expected to constitute an unwarranted invasion of personal

privacy." 5 U.S.C. § 552(b)(7)(C). Because neither party disputes that booking photographs are "records or information compiled for law enforcement purposes," Exemption 7(C) prompts only two questions in this case. The first is whether booking photographs contain the sort of "intimate personal" information that the law has traditionally considered to be private. *Favish*, 541 U.S. at 166. If the government overcomes that burden, it must also show that disclosing such photographs would result in an *unwarranted* invasion of privacy. *Id.* at 171. In my view, the Department of Justice (DOJ) has not met its burden as to either question.

II

Exemption 7(C) allows the government to withhold only those records that invade a cognizable personal privacy interest. 5 U.S.C. § 552(b)(7)(C). It is well settled that not every personal privacy interest counts, and the mere possibility that information might embarrass is not sufficient. *See Schell v. U.S. Dep't of Health & Human Servs.*, 843 F.2d 933, 939 (6th Cir. 1988); *Sims v. CIA*, 642 F.2d 562, 575 (D.C. Cir. 1980). We assume that when Congress enacted Exemption 7(C), it was aware of state and federal privacy law, and the deep cultural and legal traditions that that law reflects. *See Favish*, 541 U.S. at 169. For this reason, when considering what privacy interests Congress intended Exemption 7(C) to protect, the Supreme Court has looked not to some pliable, amorphous notion of privacy, but rather to history, the common law, and state and federal practice, which together comprise the background against which Congress legislated. *See id.* at 167–69; *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 763–70 (1989). As I see it, this background does not support the recognition of a privacy interest in booking photographs.

A

Controversy surrounding booking photographs, which began soon after American police departments acquired photographic technology in the second half of the nineteenth century, is nothing new. Simone Browne, *Race and Surveillance, in* Routledge Handbook of Surveillance Studies 72, 74 (Kirstie Ball et al. eds., 2012). By the end of that century, police had begun to compile booking photographs of detainees—convicted or not—and created books and rooms of the portraits called "rogues' galleries." *See, e.g., Blume v. State*, 56 N.E. 771, 773 (Ind. 1900);

*State v. Smith*, 90 S.W. 440, 442 (Mo. 1905); *Rogues' Gallery Pictures*, N.Y. Times, Mar. 29, 1903, at 12.  Police departments across the country shared booking photographs with one another, *see, e.g.*, *State ex rel. Bruns v. Clausmier*, 57 N.E. 541, 542 (Ind. 1900), and occasionally opened rogues' galleries to the public for "both technical and moral purposes," Browne, *supra*, at 74 (quoting Christian Parenti, The Soft Cage 39 (2003)); *see also* Simon A. Cole, Suspect Identities 20 (2d prtg. 2002).

Just as today, these early booking photographs brought with them consequences for those depicted.  In 1859, the *American Journal of Photography* observed that "[a]s soon as a rascal becomes dangerous to the public, he is taken to the Rogues' Gallery and is compelled to leave his likeness there, and from that time on he may be known to any one."  Alan Trachtenberg, Reading American Photographs 29 (6th prtg. 1999) (quoting 2 Am. J. Photography 75, 75–77 (1859)).  That likeness would remain on public display long after conviction, *see* Pa. Prison Soc'y, One Hundred and Second Annual Report, *reprinted in* 28 J. Prison Discipline 5, 29 (1889), and those photographed often endured "shame, humiliation, and disgrace," *Leger v. Warren*, 57 N.E. 506, 507 (Ohio 1900).  Even those subsequently cleared of wrongdoing occasionally found themselves subjected "to ridicule . . . and to the constant suspicions of police." *The Fateful Photograph of Duffy*, 47 Current Literature 120, 120 (1909).

Nevertheless, the collection and exhibition of booking photographs went unchallenged for decades, and in the absence of a common-law right to privacy, courts rejected early efforts to enjoin the practices. *See Owen v. Partridge*, 82 N.Y.S. 248, 250–53 (Sup. Ct. 1903); *People ex rel. Joyce v. York*, 59 N.Y.S. 418, 418 (Sup. Ct. 1899); *Publication of Bertillon Measurements and Photographs of Prisoners, Innocent or Acquitted of the Crimes Charged Against Them*, 57 Cent. L.J. 261, 261 (1903) ("Under th[e] state of the law [a] . . . man has no right of privacy that can be violated by a publication of his picture and measurements in the rogue's gallery . . . .").  In 1904, for example, New York's highest court decided one of the first appeals involving an acquitted man's suit to force police to return his booking photograph.  *In re Molineux*, 69 N.E. 727, 728–29 (N.Y. 1904).  The court rejected the man's claim, explaining that his photograph was a matter of public record in which he had no legitimate interest. *Id.* at 728.

The court's view was by no means singular.  *See Shaffer v. United States*, 24 App. D.C. 417, 426 (D.C. Cir. 1904); *Mabry v. Kettering*, 117 S.W. 746, 747 (Ark. 1909) (per curiam). As one leading treatise explained, police could lawfully disseminate the booking photographs of even suspected criminals, so long as the suspicion was well founded.  *See* 1 Christopher G. Tiedeman, A Treatise on State and Federal Control of Persons and Property in the United States 157 (1900); *accord* Leading Legal Article, 17 Harv. L. Rev. 142, 142 (1903) ("So far as the subjects are really suspicious characters, the system cannot be criticised . . . ."); *Publication of Bertillon Measurements*, *supra*, at 261.

Early reluctance to interfere with police photography is perhaps unsurprising given that the common law has traditionally protected public access to criminal proceedings.  This "tradition of accessibility" was a fundamental aspect of English common law, *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 605 (1982) (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 589 (1980) (Brennan, J., concurring in the judgment)), and played "a[n] important . . . role in the administration of justice . . . for centuries before our separation from England," *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 508 (1984).  *See generally Richmond Newspapers*, 448 U.S. at 567 (plurality opinion) ("[T]he openness of trials was explicitly recognized as part of the fundamental law of the Colony.").  Nor was the tradition of openness limited to criminal trials.  As the Supreme Court has emphasized, "[a]rrests, indictments, convictions, and sentences" are all "public events."  *Reporters Comm.*, 489 U.S. at 753; *see also Paul v. Davis*, 424 U.S. 693, 713 (1976) (finding no due-process right to privacy in a "record of an official act such as an arrest"); *Sorrentino v. City of Philadelphia*, No. Civ. A. 96-6604, 1997 WL 597990, at *7 (E.D. Pa. Sept. 16, 1997) ("[A]n individual's mug shot photo is a matter of public record not subject to constitutional protection." (citing *Davis*, 424 U.S. at 712–14)).

B

The result of the traditional common-law rule was not universally popular, *see, e.g.,* Editorial, 16 Am. Law. 51, 52 (1908); Recent Cases, 13 Yale L.J. 51, 51 (1904), and some courts and legislatures intervened to protect the likenesses of "honest" individuals who had not been convicted, *Itzkovich v. Whitaker*, 39 So. 499, 500 (La. 1905); *see also* N.Y. Penal Law § 516

(1909); *Downs v. Swann*, 73 A. 653, 656 (Md. 1909). But even after the development of invasion-of-privacy torts that created a remedy for misleading representations, *see* 3 Restatement (Second) of Torts § 652E ill. 7, at 397 (Am. Law Inst. 1977), courts recognized that public authorities could disseminate truthful information about a criminal defendant who had already appeared in open court, given that an individual's life "ceases to be private by reason of indictment and becomes a matter of public interest," *McGovern v. Van Riper*, 54 A.2d 469, 472 (N.J. Ch. 1947); *see, e.g., E.B. v. Verniero*, 119 F.3d 1077, 1099–1100 (3d Cir. 1997); *Detroit Free Press, Inc. v. Oakland Cty. Sheriff*, 418 N.W.2d 124, 127–30 (Mich. Ct. App. 1987); *City of Carrollton v. Paxton*, No. 03-13-00838-CV, 2016 WL 1566400, at *3 (Tex. App. Apr. 14, 2016); *Fernicola v. Keenan*, 39 A.2d 851, 851–52 (N.J. Ch. 1944); *Bridges v. State*, 19 N.W.2d 529, 539 (Wis. 1945).

Thus the outcome of lawsuits against newspapers for publishing photographs of those accused of crimes. Rejecting the notion that arrestees have a legitimate privacy interest in their photographs after indictment, courts have explained that, once indicted, individuals become figures of public interest. Publishing their photographs is thus not an invasion of privacy. *See Frith v. Associated Press*, 176 F. Supp. 671, 676 (E.D.S.C. 1959); *Kapellas v. Kofman*, 459 P.2d 912, 924 (Cal. 1969) (en banc); *Coverstone v. Davies*, 239 P.2d 876, 880 (Cal. 1952) (en banc); *Lincoln v. Denver Post*, 501 P.2d 152, 154 (Colo. App. 1972); *Barbieri v. News-Journal Co.*, 189 A.2d 773, 774–75 (Del. 1963); *Pemberton v. Bethlehem Steel Corp.*, 502 A.2d 1101, 1119 (Md. Ct. Spec. App. 1986).

The Restatement of Torts confirms that individuals accused of criminal activity have no cognizable privacy interest with respect to their prosecution because they are "persons of public interest, concerning whom the public is entitled to be informed." 3 Restatement (Second) of Torts § 652D cmt. f, at 389. In one particularly apposite illustration, the Restatement provides:

> A is tried for murder and acquitted. During and immediately after the trial B Newspaper publishes daily reports of it, together with pictures and descriptions of A and accounts of his past history and daily life prior to the trial. This is not an invasion of A's privacy.

*Id.* § 652D ill. 13, at 390.

In sum, it appears that the common law did not, and does not now, recognize an indicted defendant's interest in preventing the disclosure of his booking photograph during ongoing criminal proceedings.

C

Consistent with historical practice and state common law, the vast majority of states do not recognize a statutory privacy interest that would require state and local authorities to withhold booking photographs in the ordinary case. *See, e.g.*, Opinion No. 03-205, 68 Op. Cal. Att'y Gen. 132, 132–37 (2003); Opinion of June 14, 2007, 92 Md. Op. Att'y Gen. 26, 49. Booking photographs are either available, or presumptively available, to the public under the law of most states. Br. of Amici Curiae Reporters Committee for Freedom of the Press et al. 7; *see, e.g.*, Minn. Stat. § 13.82, subdiv. 26(b); N.D. Cent. Code § 44-04-18.7(2)(i); Neb. Rev. Stat. § 29-3521; Okla. Stat. tit. 51, § 24A.8(A); Va. Code Ann. § 2.2-3706(A)(1)(b); *Patterson v. Allegan Cty. Sheriff*, 502 N.W.2d 368, 369 (Mich. Ct. App. 1993); *State ex rel. Borzych v. Paluszcyk*, 549 N.W.2d 253, 254 (Wis. Ct. App. 1996); Opinion No. 2004-108, 2004 WL 771846 (Op. Ala. Att'y Gen. 2004); Opinion No. 03-09, 2003 WL 21642768 (Op. Haw. Office Info. Practices 2003); Opinion of June 14, 2007, 92 Md. Op. Att'y Gen. at 49–50; Opinion No. 2012-22, 2012 WL 6560753 (Op. Okla. Att'y Gen. 2012); Clayton Norlen, *Judge Orders Release of Photos*, Deseret Morning News, May 16, 2009, at B6 (discussing Utah law).

The majority counters that state policies are not conclusive as to Exemption 7(C)'s meaning, and urges that DOJ's regulations and policies are "[m]ore important to the FOIA analysis." Majority Op. at 8. But DOJ's own actions undercut its position that individuals have a strong privacy interest in their booking photographs. It was not long ago that DOJ sought to use booking photographs as evidence in criminal proceedings, *see, e.g.*, *United States v. Rodriguez*, 925 F.2d 1049, 1054 (7th Cir. 1991), and the ATF and FBI maintain a small number of booking photographs on their websites, *see* Br. of Amici Curiae Reporters Committee for Freedom of the Press et al. 10–11. What is more, although DOJ's current policy is to not release booking photographs except "when a law enforcement purpose is served," Appellant Reply Br. 19 n.1; *see also* 28 C.F.R. § 50.2(b)(7)–(8), even before we ruled on Exemption 7(C)'s applicability, at least one DOJ office appears to have routinely made such photographs available

to the media without any law-enforcement rationale at all. *See* Lou Gefland, *Noriega's Mug Shot Was a Photograph Worth Printing*, Minneapolis-St. Paul Star Trib., Jan. 21, 1990, at 23A.

D

The above-described background of history, common law, and state and federal practice gives meaning to the words "personal privacy" in Exemption 7(C), and suggests that an individual has no cognizable privacy interest in his booking photograph once he has already been indicted and has appeared in open court. Disregarding this legal backdrop, the majority emphasizes the embarrassment that a booking photograph may cause to the depicted individual. Majority Op. at 4–5. Even if an individual's booking photograph conveys embarrassing information that the public fact of his indictment and his appearance in open court do not, *but see Detroit Free Press, Inc. v. Dep't of Justice* (*Free Press I*), 73 F.3d 93, 97 (6th Cir. 1996), the majority's emphasis on embarrassment misses the point. Information can be both public and embarrassing, *see Sims*, 642 F.2d at 575, and the fact that a record is embarrassing does not answer the question whether an individual can reasonably expect that record to remain private, *see Schell*, 843 F.2d at 939.

In an age in which law enforcement routinely makes booking photographs available to the press, the public has come to expect that such photographs will be accessible. *See, e.g.*, Larry McDermott, *Where Are Photos of Church Fire Suspects?*, The Republican, Jan. 5, 2009, at C7. Those who are arrested are aware of this reality, and some even use their booking photographs as a way to communicate with the public. *See, e.g.*, Giacomo Papi, Under Arrest 177 (2006) (describing booking photograph in which "Steve McQueen raises his hand in a peace sign"); Joe Tacopino, *Perry's Mug of Defiance*, N.Y. Post, Aug. 20, 2014, at 25 ("Texas Gov. Rick Perry gave a confident smile as he posed for his mug shot . . . ."); *Snippets*, Hous. Chron., Apr. 15, 1996, at 2 (describing booking photograph in which Jane Fonda "do[es] [a] 'Power to the People' raised-fist salute"). Unlike deeply personal matters, such as the death-scene images at issue in *National Archives & Records Administration v. Favish*, 541 U.S. 157 (2004), individuals simply do not expect their booking photographs to remain shielded from public view.

Of course, an individual can have a statutory privacy interest in information that is public. In *United States Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749 (1989), the Supreme Court found a cognizable privacy interest in rap sheets that contained publicly available information about individuals' arrests, charges, convictions, and incarcerations. *Id.* at 752, 770–71. But it does not follow that all public information "connecting an individual to criminality" is protected by a statutory right to privacy. Majority Op. at 4. The *Reporters Committee* Court emphasized that rap sheets are different from other sorts of publicly available records because they compile "otherwise hard-to-obtain" information from multiple offices in multiple jurisdictions into one document, thus "alter[ing] the privacy interest implicated by the disclosure of that information." 489 U.S. at 764. The booking photographs at issue here, by contrast, do not compile any information that is difficult to find.

The majority also puts great emphasis on the fact that "an idle internet search reveals the same booking photo that once would have required a trip to the local library's microfiche collection." Majority Op. at 5. That is undoubtedly true. But the same could be said of any of the now-digitized information that was once hidden away in the dusty basements of courthouses and libraries. Surely the majority would not agree that an individual has a cognizable privacy interest in his court filings or public statements simply because they too may turn up in an "idle internet search." If anything, the ease with which a third party today can find an individual's indictment and arrest would seem to cut against finding a cognizable privacy interest in booking photographs. *Cf. ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 12 (D.C. Cir. 2011) (observing that public disclosure of docket-sheet numbers of selected criminal cases "will simply provide one more place in which a computerized search will find the same person's name and conviction").

In sum, the majority is able to find a privacy right in booking photographs only by espousing a narrow conception of public information that is out of step with the "literal understandin[g]" of privacy. *Reporters Comm.*, 489 U.S. at 763; *see also* Webster's Ninth New Collegiate Dictionary 936 (1986) (defining "private" as "not . . . intended to be known publicly" or "unsuitable for public use or display"); *Reporters Comm.*, 489 U.S. at 753 (explaining that "[a]rrests" and "indictments" are "public events"). An individual who has already been indicted,

and who has already appeared in open court, has no cognizable privacy interest in his booking photograph because neither he nor society expects that it will remain hidden from public view.

III

Even if an indicted individual has a privacy interest in his booking photograph, whatever invasion of privacy disclosure occasions is not "unwarranted" in light of the weighty public interests that disclosure serves. Public oversight is essential in criminal proceedings, in which the government wields the power to place the individual in jeopardy of imprisonment. Closing a window into such proceedings undermines the public confidence that is essential to any effective criminal-justice system, for it is "difficult for [citizens] to accept what they are prohibited from observing." *Richmond Newspapers*, 448 U.S. at 572 (plurality opinion); *see also Press-Enter. Co.*, 464 U.S. at 508–09. Applying this principle, we have emphasized the role of "the public, deputizing the press as the guardians of their liberty," in shielding the individual from governmental abuse. *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 683 (6th Cir. 2002). Booking photographs play an important role in educating the public about its government, just as open courts and open hearings do.

Measured against the photographed individual's meager interest in avoiding the disclosure of matters that are largely available in the public domain, *see ACLU*, 655 F.3d at 12, the public's interest in knowing whom the government is prosecuting is strong. The regular release of booking photographs helps to avoid cases of mistaken identity, by prompting individuals to assist the government in finding the actual perpetrator. Cases of mistaken identity are all too common, *see, e.g.*, Topher Sanders, *Name Mix-Up in Sexual Battery Case Sends Wrong Clay County Teen to Jail for 35 Days*, Fla. Times-Union, Feb. 24, 2014; Christopher N. Osher, *Mistaken Identities Errors Clutter Denver Arrests*, May 24, 2009, Denver Post, at A1, and photographs can help to clear the names of innocent individuals, *see, e.g.*, Joyce Purnick, *Few Answers After Settling a Bad Arrest*, N.Y. Times, Mar. 15, 2001, at B1.

Moreover, booking photographs also reveal what populations the government prosecutes—black or white, young or old, female or male—and for what sorts of alleged crimes. Their release may raise questions about prosecutorial decisions, enabling the public to detect and

hold to account prosecutors who disproportionately charge or overlook defendants of a particular background or demographic. Such oversight is important in a system such as ours, in which prosecutors enjoy wide discretion in choosing whom to charge. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996). Indeed, giving public authorities discretion to release booking photographs may even create the potential for, or the perception of, unfairness. *Cf.* Todd Wallack, Bost. Globe, Mar. 11, 2015, at A (recounting allegations that "police . . . treat [disclosure of] charges against their own officers differently than the general public"); Alex Zielinski, *The Brock Turner Mug Shot Police Really Didn't Want You to See*, ThinkProgress (June 6, 2016, 6:09 PM), http://thinkprogress.org/justice/2016/06/06/3785310/brock-turner-mug-shot ("One Twitter user . . . posted screenshots from past *Washington Post* articles to make the point that [the white defendant] was being treated differently . . . .").

Booking photographs can also help the public learn about what the government does to those whom it detains. In *Free Press I*, we explained that "[h]ad the now-famous videotape of the Rodney King beating in Los Angeles never been made, a mug shot of Mr. King released to the media would have alerted the world that the arrestee had been subjected to much more than a routine traffic stop and that the actions and practices of the arresting officers should be scrutinized." 73 F.3d at 98. Our observation was not conjecture. In one recent example, the release of a New Mexico booking photograph that showed an arrestee's bloodied and scratched face prompted local media to inquire into the circumstances of his arrest. *See* Royale Da, *MDC: State Fair Worker Assaulted by Inmate Prior to Mugshot*, KOAT 7 Albuquerque (Sept. 18, 2014), http://www.koat.com/news/mdc-state-fair-worker-assaulted-by-inmate-prior-to-mugshot/28141730. In another, the publication of an Alabama booking photograph that showed an individual with "two black eyes" led "viewers [to] expres[s] outrage" because "[t]hey think authorities used excessive force." Rae Larkins, *Large Amount of "Spice" Recovered in Dothan Bust*, KCBD 11 (Feb. 19, 2016, 3:08 PM), http://www.kcbd.com/story/31199484/large-amount-of-spice-recovered-in-dothan-bust. These anecdotes suggest that booking photographs play a role in building public awareness of what law enforcement does and why, which in turn enables the public to hold authorities to account.

The majority ignores these benefits and omits the question of balancing altogether, leaving it to DOJ to make a case-by-case determination of whether it believes that the release of a particular booking photograph serves its own purposes. *See* Majority Op. at 8–9. That decision undermines FOIA's goal of disclosure by effectively making DOJ the arbiter of whether a booking photograph will be made public. Under FOIA, the burden of justifying *non*disclosure should always fall on the government. *Reporters Comm.*, 489 U.S. at 755, 778. But if newspapers like the *Detroit Free Press* have to "wrangle with" DOJ "over the relative public interest" of every single booking photograph that they seek to publish, few, if any, booking photographs that DOJ withholds will become public because "[n]o newspaper could ever timely publish booking photos alongside an article about a new indictment." Appellee Supp. Br. 25.

Even if news organizations bear the time and expense of taking DOJ to court, "assigning federal judges the task of striking a proper case-by-case . . . balance between individual privacy interests and the public interest in" disclosure is likely to be onerous, especially as the basis of these "ad hoc" decisions would be largely standardless. *Reporters Comm.*, 489 U.S. at 776. Nor does it help much that a detainee may "waive" his or her privacy interest. Majority Op. at 9. FOIA does not require agencies to notify an individual when a third party requests his records. Maj. John F. Joyce, *The Privacy Act*, 99 Mil. L. Rev. 113, 156 (1983). In the absence of such notice, few indictees in the midst of organizing a defense will know to request their own booking photographs under FOIA or the Privacy Act, 5 U.S.C. § 552a. Moreover, the release of one individual booking photograph could never reveal the structural disparities in prosecutorial discretion that the regular release of many could. *Cf. Floyd v. City of New York*, 861 F. Supp. 2d 274, 290 (S.D.N.Y. 2012). For these reasons, the Supreme Court has suggested that in cases such as this one, where the "individual circumstances" of a given request are less important than the effect of disclosure on the whole, Exemption 7(C) allows for categorical determinations. *Reporters Comm.*, 489 U.S. at 776.

IV

I am not unaware of the consequences of releasing booking photographs in the Internet Age. Ever since the nineteenth century, booking photographs have proven to be a source of discomfort to those depicted. *See, e.g.*, *Warren*, 57 N.E. at 507; Pa. Prison Soc'y, *supra*, at 29;

*The Fateful Photograph of Duffy*, *supra*, at 120. But today's decision does nothing to prohibit DOJ from using its broad discretion to release booking photographs when it chooses. Nor does today's decision do anything to protect the likenesses of those arrested by state authorities, the majority of which disclose booking photographs to the media upon request. *See, e.g.*, Carissa Wolf et al., *FBI Seals Off Ore. Refuge After Arrests*, Wash. Post, Jan. 28, 2016, at A1 (depicting state booking photographs of individuals awaiting disposition of federal charges). All that today's decision does is provide DOJ with a tool to selectively shield itself from public scrutiny.

It is possible that other means could be used to achieve a sensible balance between reputational concerns and the free flow of public information. *See, e.g.*, Act of May 6, 2013, § 1, 2013 Ga. Laws 613, 614 (requiring website owners to remove booking photographs of those acquitted of criminal activity); *Taha v. Bucks County*, 9 F. Supp. 3d 490, 494 (E.D. Pa. 2014) (holding that individual depicted on "bustedmugshots.com" with the "legend 'BUSTED!' in large bold letters over his mugshot" could maintain state-law "false light" tort claim where individual's arrest record had in fact been expunged). But today's decision, which deprives the public of vital information about how its government works and does little to safeguard privacy, is not the correct answer. For these reasons, I respectfully dissent.